[Civ. No. 13297. Third Dist. July 31, 1972.]

RIVER GARDEN FARMS, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF YOLO COUNTY, Respondent;
SHARON O. LAMBERT, a minor, etc., Real Party in Interest.

988

**COUNSEL**

Richard Mills for Petitioners.

No appearance for Respondent.

Fitzwilliam, Memering, Stumbos & DeMers, Louis A. DeMers and Robert Memering for Real Party in Interest.

**OPINION**

**FRIEDMAN, Acting P. J.**—Petitioners are the remaining defendants in a personal injury suit pending in the Yolo County Superior Court. Three other defendants settled with the plaintiff minor and received releases. Petitioners charge that these releases were not given in good faith as required by Code of Civil Procedure section 877, violating California statutes which authorize pre-verdict settlement with one of several joint tortfeasors and thus evoking the common law rule that the release of one joint tortfeasor releases all.

Pursuing this thesis, petitioners unsuccessfully sought dismissal in the superior court. They seek mandate here to compel dismissal or other appropriate relief. They name Sharon Lambert, the minor plaintiff, as real party in interest.

The question calls for interpretation of an untested statutory provision, the "good faith" clause of Code of Civil Procedure section 877.[1]

---

[1]Code of Civil Procedure section 877 provides: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—(a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the cove-

California formerly adhered to the common law doctrines denying contribution among joint or concurrent tortfeasors and viewing the release of one as a release of all. (See *Witt* v. *Jackson,* 57 Cal.2d 57, 70 [17 Cal. Rptr. 369, 366 P.2d 641]; *Pellett* v. *Sonotone Corp.,* 26 Cal.2d 705, 710 [160 P.2d 783, 160 A.L.R. 863].) In 1957 sections 875 to 880 of the Code of Civil Procedure were adopted. Three of these provisions are important here. Section 875 establishes a right of post-judgment contribution among negligent tortfeasors held liable by a single judgment. Section 876 requires them to share in the judgment debt pro rata, that is, equally, a single share being allocated where one defendant is vicariously liable for the fault of another. Section 877 permits pre-verdict releases "given in good faith" to one of several tortfeasors; such a release completely discharges the settlor, prevents contribution claims against him by the eventual judgment debtor and results in *pro tanto* reduction in the amount the injured party can collect from the judgment debtor. (*De Cruz* v. *Reid,* 69 Cal.2d 217, 225-226 [70 Cal.Rptr. 550, 444 P.2d 342].)

In 1969 Sharon Lambert, age 10, and her brother Jessie, age 9, lived with their parents in a small ranch building or cottage owned by River Garden Farms, employer of Mr. Lambert. The cottage was furnished to Lambert as part of his compensation. While Lambert was painting the interior of the cottage, a fire broke out and destroyed the building. Both parents were killed and the two children severely burned. The burns apparently left both children with serious and permanent disfigurements and physical handicaps.

Four business firms or groups incurred potential liability for the children's injuries: Fuller-O'Brien Corporation, manufacturer of the paint used by Mr. Lambert; Pargas, Inc. and Van Gas, Inc., who supplied liquid propane to a water heater in the cottage; fourth, the petitioners, owners of the cottage and owners and operators of River Garden Farms.[2] For convenience' sake, we shall refer to these parties as "defendants." The children also have claims under the wrongful death statute. One of the River Garden Farms entities was Mr. Lambert's employer; its workmen's compensation liability bars a wrongful death action against it. With that exception, all defendants incurred potential liability for the deaths.

nant, or in the amount of the consideration paid for it whichever is the greater; and (b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors."

[2]In actuality, several firms and individuals are connected with the River Garden Farms operation and are petitioners here. These are: River Garden Farms, Inc.; K. S. Adams, Jr., and Curtis K. Canter, as individuals; K. S. Adams, Jr., and Curtis K. Canter as partners doing business under the firm name of River Garden Farms Company.

Sharon and Jessie are represented by the same attorneys. After the appointment of a guardian ad litem, Sharon filed a personal injury action against the four defendants in Yolo County. No suit to recover for Jessie's injuries has yet been filed. No wrongful death action has yet been filed. Settlement discussions ensued among the parties. In the personal injury action brought by Sharon, River Garden Farms filed a cross-action seeking indemnity from the other defendants. Within the framework of that same lawsuit, a court-supervised settlement conference took place in March 1971. The court tentatively suggested a settlement figure for each child and an apportionment among the four defendants, but no settlement occurred.

Acting under the statutes for approval of minors' compromise (Code Civ. Proc., § 372; Prob. Code, § 1431), the children's attorneys filed a petition in April 1971, requesting court approval of a proposed compromise of the two minors' claims against Pargas, Inc. The compromise covered both the personal injury and wrongful death claims. The court approved a settlement by which Pargas was released upon payment of $250,000. Under the court's order $75,000 was allocated to the settlement of each child's personal injury claim and $50,000 to each wrongful death claim.

Two months later, in June, the claimants concluded settlements with two other defendants, Van Gas, Inc., and Fuller-O'Brien Corporation. In response to the minors' petition the court approved settlement by which Van Gas paid $625,000 and Fuller-O'Brien $415,000. The children's attorney requested that the aggregate settlement of $1,040,000 be allocated as follows: $350,000 to the wrongful death claim of each child and $170,000 to each personal injury claim. An attorney representing Van Gas objected to the allocation of $700,000 to the wrongful death claims as excessive. The court found the allocation reasonable and approved it.

River Garden Farms describes its predicament in somewhat the following terms: Counsel for the children have arrived at successive settlements with the other three defendants, leaving River Garden Farms as the sole target of liability. In view of the children's severe and permanent physical handicaps, the personal injury claims have a potential for much larger verdicts than the wrongful death claims. The latter, moreover, lose value for settlement purposes because one or both the senior Lamberts might have been guilty of contributory negligence. Notwithstanding these comparative appraisals, the attorneys for the children (with court approval) have chosen to allocate the major share of the settlements to the less valuable wrongful death claims and a minor share to the potentially large personal injury liability. As a result of the three settlements, $800,000 has been applied

to the wrongful death claims and $490,000 to the personal injury claims.[3] The attorneys for the children did not notify River Garden Farms of the proposed settlements with the other defendants or of their applications for court approval. The attorneys for the children had originally offered to settle all claims for $2,000,000, then withdrew the offer. At the abortive settlement conference, the court had tentatively suggested a total settlement figure of $1,600,000. Subsequently River Garden Farms offered $700,000, the sum recommended by the court, as its share of a complete settlement. The attorneys for the children have most recently offered to settle with River Garden Farms for $3,850,000 less the $1,290,000 received from the other defendants. Such a settlement would require River Garden Farms to bear about two-thirds of the liability it once shared with three other defendants.

Petitioners contend that the allocation of a disproportionately large share of the settlements to the wrongful death claims has isolated petitioner as the sole target for potentially large personal injury judgments which it will bear alone, without contribution and with credit only for the relatively minor share of the settlements allocated to the personal injury claims. Under the circumstances, petitioners contend, the settlements were not given in good faith as required by section 877. Petitioners do not charge inadequacy of the amounts paid in settlement or collusion or other inequitable conduct by the settling defendants. The charge of bad faith is aimed at the claimants alone and is based upon the claimants' ex parte, although court-approved, allocation of the settlement proceeds.

I

The injured claimants contend that the duty of good faith is limited to the parties to the settlement. They point out that an injured person may choose among those with whom he will negotiate and settle. He may sue one defendant and ignore others.[4] The contribution statutes establish no right of contribution before judgment, but only a right of contribution among joint judgment debtors. (Code Civ.

[3]Interestingly enough, the $250,000 settlement with Pargas, Inc., was apportioned between the wrongful death claims and the injury claims in the ratio of 3 to 2. The two later settlements, aggregating $1,040,000, were divided in somewhat inverse proportions, approximately two-thirds to the wrongful death claims and one-third to the injury damages.

[4]See 9 Hastings Law Journal 180, 186, 188-189; 32 State Bar Journal 552, 555. Omission from the contribution statutes of any provision for compulsory joinder of parties defendant should be considered in relation to general practice provisions for bringing in new parties by cross-complaint. See *Thornton* v. *Luce,* 209 Cal.App.2d 542, 551-552 [26 Cal.Rptr. 393]. As to actions commenced July 1, 1972, and thereafter, see Code of Civil Procedure sections 426.30, 428.10, 428.20.

Proc., § 875, subd. (a); *Augustus* v. *Bean,* 56 Cal.2d 270, 272 [14 Cal. Rptr. 641, 363 P.2d 873].) The contribution rights of the judgment debtors do not impair the plaintiff's right to collect the entire judgment from any one of them. (Code Civ. Proc., § 875, subd. (g).) Thus a plaintiff may turn his back on collective negotiations.

It does not follow that the good faith burdens only the vis-à-vis relationship of the negotiating parties. Nor does it follow that they may negotiate and settle in disregard of a tortfeasor whom the claimant reserves for later negotiation or suit. In every contract there is an implied obligation of good faith and fair dealing. (*Comunale* v. *Traders & General Ins. Co.,* 50 Cal.2d 654, 658-659 [328 P.2d 198, 68 A.L.R.2d 883].) Were the obligation of good faith limited to the settling parties, no statutory demand for release "given in good faith" would have been necessary. In the absence of direct decisional guidance, we seek the meaning and effect of that statutory demand as revealed by the objectives of the legislation in which it is found.

 The major goals of the 1957 tort contribution legislation are, first, equitable sharing of costs among the parties at fault, and second, encouragement of settlements.[5] Auxiliary to the latter is some assurance of settlement finality. Because the statute limits contribution to the judgment debtors, the concept of equitable sharing stops far short of equal sharing. (See *Wouldridge* v. *Zimmerman,* 21 Cal.App.3d 656, 658 [98 Cal.Rptr. 778].) Each prejudgment settlement affects the ultimate expense borne by each judgment debtor. Absent a prejudgment settlement, all defendants found liable would share pro rata, that is, equally. By settling before verdict, one defendant may acquit himself by contributing something less than his equal share, leaving the other defendants saddled with the entire judgment less *pro tanto* credit for the settlement. The cheaper the settlement, the smaller the *pro tanto* credit. Thus a nonnegotiating defendant has a palpable financial interest in the amount at which the negotiating defendant settles.

---

[5]The 1957 tort contribution legislation was sponsored by the State Bar of California (see 32 State Bar J. 17). In explaining the bill to the Senate Judiciary Committee, the State Bar declared: "The ancient basis of the rigid rule against contribution in this type of case is the policy that the law should deny assistance to tortfeasors in adjusting losses among themselves because they are wrongdoers and the law should not aid wrongdoers. But this overemphasized the supposed penal character of liability in tort; it ignores the general aim of the law for equal distribution of common burdens and of the right of recovery of contribution in various situations, e.g., among cosureties. It ignores also the fact that most tort liability results from inadvertently caused damage and leads to the punishment of one wrongdoer by permitting another wrongdoer to profit at his expense." (1 Sen. J. Appendix (Reg. Sess. 1957) p. 130.)

For analytical discussions of the purposes underlying tort contribution legislation, see 18 Stanford Law Review 486; 9 Hastings Law Journal 180.

The California legislation empowers a plaintiff, armed with a strong and lucrative claim, to settle with his antagonists one by one, preserving for the jury the opponent with the most money and least sympathy. The power is great and vulnerable to abuse. In a multi-party case the threat of an unshared judgment against the last remaining defendant—diminished only by meager settlements with his eager fellows—permits a plaintiff to create acute financial pressures bordering on extortion.[6] Viewed as a demand for settlements which have a reasonable relation to the value of the plaintiff's case, to the strengths and weaknesses of the parties and the financial ability of the settlor, the good faith clause aids the statutory goal of equitable sharing. It also aids the goal of settlement, by preventing a plaintiff from selecting one defendant as the target for enlarged demands after unreasonably low settlements with others.

The common law rule denying contribution among tortfeasors furnished little occasion for the formulation of standards of duty *inter sese*. In other areas of the law, where common law contribution among joint obligors existed, the courts concluded that contribution had an equitable origin and would be governed by equitable standards. A California court declared: "The underlying idea is that it is just and equitable for the person benefited to pay his proportionate share." (*Murchison* v. *Murchison*, 219 Cal.App.2d 600, 604 [33 Cal.Rptr. 285]; see also, *Blankenhorn-Hunter-Dulin Co.* v. *Thayer*, 199 Cal. 90, 96 [247 P. 1088, 48 A.L.R. 797]; 18 Am.Jur.2d, Contribution, § § 4, 5.) A New Jersey court quoted from Story's Equity Jurisprudence (11th ed.) sections 492, 493: " 'Any other rule would put it in the power of the creditor to select his own victim; and, upon motives of mere caprice or favoritism, to make a common burden a most gross personal oppression.' " (*Kennedy* v. *Camp,* 14 N.J. 390 [102 A.2d 595, 600].)

As statutory and decisional modifications eroded the anti-contribution doctrine in the field of torts, American courts picked up the equitable standards prevailing in other areas of contribution law and applied them to contribution suits between tortfeasors, denying contribution for a settlement which was found to be unreasonable, excessive, collusive or otherwise unfair to the person sued for contribution. (*Consolidated Coach Corporation* v. *Burge,* 245 Ky. 631 [54 S.W.2d 16, 18, 85 A.L.R. 1086]; *Congres-*

---

[6]A comment in 18 Stanford Law Review at page 490 puts the matter thusly: "Another advantage inherent in a contribution law is that it prevents the plaintiff from blackmailing each tortfeasor by threatening to sue him for all the damages unless he settles for a high figure. It is conceivable that the plaintiff could use a rule denying contribution as a bludgeon, forcing each tortfeasor to settle for more than his pro rata share of the damages, thereby obtaining more than one satisfaction for his harm."

*sional Country Club* v. *Baltimore & O. R. Co.*, 194 Md. 533 [71 A.2d 696, 700]; *Rusch* v. *Korth,* 2 Wis.2d 321 [86 N.W.2d 464], overruled on other grounds 8 Wis.2d 512 [99 N.W.2d 746, 750]; *Trampe* v. *Wisconsin Telephone Co.,* 214 Wis. 210 [252 N.W. 675, 677-678]; 1 Harper and James, The Law of Torts, pp. 718-719; 18 Am.Jur.2d, Contribution, §§ 87, 107.) Inferentially, the California demand for release in good faith was designed to accomplish a similar result, that is, to establish a standard of equitable conduct embracing other defendants as well as the immediate parties to the settlement.[7]

The legislative history of the good faith clause supports this inference. As introduced, the bill (Sen. Bill 1510, 1957 Reg. Sess.) did not include the good faith provision. The latter was inserted into section 877 by a committee amendment during the legislative session. (3 Assem. J. (Reg. Sess. 1957) p. 4716.)

In 1955, two years earlier, the National Conference of Commissioners on Uniform State Laws had revised an earlier version of a proposed Uniform Contribution Among Tortfeasors Act. As revised in 1955, section 4 of the uniform act was cast in the mold later assumed by section 877. In substance it declared that a settlement given in good faith by one of several tortfeasors would not discharge the other tortfeasors from liability, but would discharge the settlor from contribution.[8]

The Uniform Law Commissioners accompanied their 1955 revision with a statement declaring that the good faith clause "gives the court occasion to determine whether the transaction was collusive, and if so there is no discharge"; that lack of such a provision in the original draft had impeded approach to the goal "that the plaintiff should not be permitted to release one tortfeasor from his fair share of liability and mulct another instead, from motives or sympathy or spite, or because it might

---

[7]We have not overlooked subdivision (b) of section 875, Code of Civil Procedure, which declares: "Such right of contribution shall be administered in accordance with the principles of equity." Although illustrative of the equitable tenor pervading the 1957 legislation, it applies specifically to post-judgment contribution efforts and is not designed as a standard for prejudgment settlements.

[8]As revised in 1955, section 4 of the uniform act provided: "When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death: (a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and (b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor." (See 9 Uniform Laws Annot. (1967 pocket part) p. 132.)

be easier to collect from one than from the other . . . ." (9 Uniform Laws Annot. (1967 pocket part) p. 132.)

No documentation establishes section 4 of the draft prepared by the Commissioners on Uniform Laws as the immediate progenitor of the legislative committee amendment which added the good faith requirement to section 877. The parallelism of language (compare fns. 1 and 8, *ante*) establishes an inference that the committee amendment sought to accomplish the "fair share" objective described in the comments of the Commissioners on Uniform Laws. If the limited objectives of the California law allowed a well-armed plaintiff to pick off his antagonists one by one, he would at least be compelled to abide by the moral standard signified by the demand for good faith release.

The notion of collusion advanced by the Uniform Law Commissioners implies something more than mere confederacy. Any negotiated settlement involves cooperation, but not necessarily collusion. ■ It becomes collusive when it is aimed to injure the interests of an absent tortfeasor. Although many kinds of collusive injury are possible, the most obvious and frequent is that created by an unreasonably cheap settlement. Applied *pro tanto* to the ultimate judgment, such a settlement contributes little toward equitable—even though unequal—sharing. As we noted earlier, unreasonably low settlements with the other tortfeasors and the fear of a large unshared judgment may propel the last remaining defendant into a settlement exceeding the plaintiff's remaining damages and transcending that defendant's equitable share. Prevention of collusion is but a means to the end of preventing unreasonably low settlements which prejudice a nonparticipating tortfeasor. ■ The price of a settlement is the prime badge of its good or bad faith.

■ Construed in the light of the legislation's objectives, the good faith release clause extends the obligation of good faith beyond the parties to the negotiations, embracing an absent tortfeasor. The latter has a financial stake in the amount of the settlement and thus a justiciable interest in the question of good faith. Petitioners are properly before the court.

## II

Petitioners contend that the disproportionate split of settlement money between the wrongful death and personal injury claims violated the good faith requirement of section 877. Real parties in interest indulge in a more limited interpretation, contending that the good faith clause is satisfied when the settling parties make full disclosure to one another.

Although the Uniform Law Commissioners pointed to collusion as the prime motivator of the good faith clause, the language of the clause is far broader. Lack of good faith encompasses many kinds of behavior. It may characterize one or both sides to a settlement. When profit is involved, the ingenuity of man spawns limitless varieties of unfairness. Thus, formulation of a precise definition of good faith is neither possible nor practicable. The Legislature has here incorporated by reference the general equitable principle of contribution law which frowns on unfair settlements, including those which are so poorly related to the value of the case as to impose a potentially disproportionate cost on the defendant ultimately selected for suit.

A standard so nebulously expressed imposes no great hardship on settlement negotiators. An analogous problem exists when an insurance carrier is called upon to exercise good faith in accepting or rejecting an offer to settle within the limits of its policy. The carrier's duty of good faith extends beyond fraud or dishonesty and encompasses any kind of unfair dealing. (*Crisci* v. *Security Ins. Co.,* 66 Cal.2d 425, 430 [58 Cal.Rptr. 13, 426 P.2d 173].) In the decisions involving wrongful refusal to settle, price is the immediate signal for the inquiry into good faith, but only one of the many factors influencing the finding. (See *Critz* v. *Farmers Ins. Group,* 230 Cal.App.2d 788, 796 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142]; *Brown* v. *Guarantee Ins. Co.,* 155 Cal.App.2d 679, 689 [319 P.2d 69].) So it is here.

In viewing the good faith provision of section 877 as an aid to equitable sharing, one must not overlook the statutory objective of encouraging settlements and assuring them a measure of finality. A potential defendant's desire for settlement is blunted when he cannot close his file on the case. (See Commissioners' Note, 9 Uniform Laws Annot. (1967 pocket part) pp. 132-133; 18 Stan.L.Rev. at pp. 488-489; 9 Hastings L.J. at pp. 187-188.) The goals of equitable sharing and settlement finality compete with each other. If the good faith clause demands equitable sharing as fixed by a jury verdict which has not yet taken place, the parties cannot negotiate safely, cannot accomplish settlement with a fair assurance of finality. All involved in the personal injury settlement business are aware of its large imponderables—the risk of victory or defeat at the jury's hands, the risk of a high or low verdict, the unknown strengths and weaknesses of defenses, the inexact appraisal of damage elements, the defendant's solvency and the extent of insurance coverage. In advance of a jury verdict, most cases permit only a rough assessment of value. When one tortfeasor chooses to settle and another chooses to litigate, inequality in the ultimate cost does not signalize bad faith. (See *Wheeler* v. *Denton,* 9 N.C.App. 167 [175 S.E.2d 769, 771-772].)

On the other hand, if the policy of encouraging settlements is permitted to overwhelm equitable financial sharing, the possibilities of unfair tactics are multiplied. Neither statutory goal should be applied to defeat the other. If the statute is to work well, the demand for good faith settlement should find its role as an accommodating factor between undesirable extremes.

Applied to strike a balance between the dual statutory objectives, the good faith clause should not invalidate a settlement within a reasonable range of the settlor's fair share. The price levels are not as unpredictable as one might suppose. Despite the uncertainties, generalized valuation criteria are recognized by the personal injury bar, insurance claims departments and pretrial settlement courts.[9] When testing the good faith of a settlement figure, a court may enlist the guidance of the judge's personal experience and of experts in the field. Represented by knowledgeable counsel, settlement negotiators can predict with some assurance whether a settlement is within the reasonable range permitted by the criterion of good faith. The danger that a low settlement violates the good faith clause will not impart uncertainty so long as the parties behave fairly and the courts maintain a realistic awareness of settlement imponderables.

In this case petitioners do not charge collusion and ascribe no fault to the settling defendants. They complain of a wrong committed by the claimants alone and given the stamp of judicial approval through the happenstance that the claimants are minors. At oral argument, counsel for the claimants urged that division of the settlement between the wrongful death and personal injury claims was an exercise of his duty to assure maximum recovery for his terribly maimed clients. Indeed, such was his duty, but it was tempered by his statutory duty of good faith settlement. If the distribution was unreasonably disproportionate to the comparative values, the impact upon petitioners—as the sole remaining personal injury defendants—was just as damaging as a collusively arranged, unreasonably low settlement. Good faith may be offended by a party's ex parte action as well as his collusive ones.

We do not decide whether the allocation violated the claimants' duty of good faith. Good or bad faith is a question of fact in each case. (*Critz* v. *Farmers Ins. Group, supra,* 230 Cal.App.2d at p. 796.) Only a trial court may reach a decision, guided by the evidentiary material presented to it.

---

[9]See Personal Injury Valuation Handbooks (Cal. ed.) (Jury Verdict Research, Inc., Cleveland, O.); Jury Verdicts Weekly (E. N. Raymond and Assoc., Santa Rosa, Cal.); AID (Accident/Injury/Damages) (issued monthly by The Lawyers' Co-op. Pub. Co. and Bancroft-Whitney.)

## III

Invoking the common law rule that a release of one tortfeasor releases all, petitioners seek their dismissal from the pending personal injury suit. Were it a legally available remedy, dismissal cannot be mandated here because no trial of the good faith issue has taken place. On the possibility that petitioners may be entitled to other relief, we seek out the effect of a bad faith settlement and the procedures for establishing it.

The good faith clause, we have concluded, establishes a duty relationship among the plaintiff, the settling defendant and the nonsettling defendant. A bad faith release may have one effect upon the parties to the settlement, another as between the parties and the nonsettling defendant. Here our concern is the sanctions available for protection of the nonsettling defendant. On the assumption that a release has been given in bad faith, three possibilities appear: (1) The release is outside the purview of section 877, activating the common law rule that release of one tortfeasor releases all. (2) The release is a nullity and does not discharge the settlor, who remains liable for eventual pro rata contribution. (3) The settlor is fully discharged, but the remaining defendant gets pro rata rather than *pro tanto* credit on the judgment.

Although petitioners argue for the first sanction, it is unavailable. The 1957 legislation was aimed at two common law rules—that prohibiting contribution among tortfeasors and that releasing all upon the release of one. To promote equitable distribution of the loss, the statute permits post-judgment contribution, leaving the common law anti-contribution rule to prevail before judgment. (*Guy F. Atkinson Co.* v. *Consani,* 223 Cal.App.2d 342, 344 [35 Cal.Rptr. 750]; *American Can Co.* v. *City & County of San Francisco,* 202 Cal.App.2d 520, 523 [21 Cal.Rptr. 33].) The second statutory objective, encouragement of settlement, cannot co-exist with the rule releasing all upon release of one. For many years before 1957, the common law release rule had been criticized as the "antiquated survival of an arbitrary common law procedural concept." (Prosser on Torts (4th ed. 1971) p. 302; see also, 9 Hastings L.J. at p. 182.) California lawyers and courts sidestepped it by draftsmanship, substituting the words of a covenant not to sue for words of release. (*Pellett* v. *Sonotone Corp., supra,* 26 Cal.2d at p. 711.) Even if conditionally evoked as a threat, the common law rule's devastating effect upon the plaintiff would discourage compromise. An injured party would have little motivation for settling with one defendant at the possible sacrifice of his claim against the other. Summoned from the grave by borderline settlements, the spectre of the common law rule would frighten the guests from the negotiating table.

Only its utter demise and its supersession by statutory controls are consistent with the settlement goal of the contribution law. ██ Section 877 implicitly but firmly dispatched it.[10]

Thus the superior court properly denied petitioner's motion to dismiss, even though it held no evidentiary hearing on the issue of good faith.

Section 877 describes the effect of a good faith release but not of one given in bad faith. The consequences of bad faith can be discerned by implication from the statute and by applying nonstatutory principles. ██ A release or covenant not to sue is a species of contract. (*Pellett* v. *Sonotone Corp.*, *supra*, 26 Cal.2d at pp. 711-712; *Matthews* v. *A. T. & S. F. Ry.*, 54 Cal.App.2d 549, 557 [129 P.2d 435].) A contract is illegal when it violates an express provision of law or contravenes the policy of an express law. (Civ. Code, § 1667.) ██ A contract may be partially illegal, having permissible and impermissible objectives. (*Keene* v. *Harling*, 61 Cal.2d 318, 321-322 [38 Cal.Rptr. 513, 392 P.2d 273].) In each case the remedy for protecting the law's policy depends upon the kind of illegality and the particular facts involved. (*Tri-Q, Inc.* v. *Sta-Hi Corp.*, 63 Cal.2d 199 [45 Cal.Rptr. 878, 404 P.2d 486]; *Lewis & Queen* v. *N. M. Ball Sons*, 48 Cal.2d 141, 147-148 [308 P.2d 713].) ██ Although in most cases only a party to the contract may invoke its illegality, a third person whose interests are affected may do so. (*Johnston* v. *Johnson*, 127 Cal.App.2d 464, 472 [274 P.2d 1]; 17 C.J.S., Contracts, § 283; 14 Williston on Contracts (3d ed. 1972) 31.)

██ When given in bad faith as to a nonsettling tortfeasor, a release is an illegal contract, offensive to the statutory policy of equitable distribution of the loss. When it is the product of collusion between the plaintiff and the settlor, both may be *in pari delicto* and barred from judicial aid. (*Harriman* v. *Tetik*, 56 Cal.2d 805, 811 [17 Cal.Rptr. 134, 366 P.2d 486].) As a nonparticipant whose ultimate liability is affected, the nonsettling tortfeasor may invoke the settlement's illegality. Through appropriate procedures, he may have it set aside. Conceivably—although we do not so decide—he might seek the offending settlor's joinder to the lawsuit as a party defendant, thus preserving his own contribution claim against the possibility of a joint judgment.

---

[10]Although California has not adopted the Uniform Contribution Among Tortfeasors Act, Code of Civil Procedure section 877 (fn. 1, *ante*) is obviously modeled upon the 1955 version of the uniform act's section 4 (fn. 8, *ante*). Several courts have recognized that section 4 completely abrogates the common law rule releasing all joint tortfeasors upon the release of one. (*Ginoza* v. *Takai Elec. Co.*, 40 Hawaii 691; *Hackett* v. *Hyson*, 72 R.I. 132 [48 A.2d 353, 166 A.L.R. 1096]; see Note 73 A.L.R.2d 403, 435; cf. *Watson* v. *McEwen*, 225 Cal.App.2d 771, 775 [37 Cal.Rptr. 677].)

■ Where, as claimed here, only the injured claimant has breached the duty of good faith, the settlor may insist upon the validity of his release and discharge. A contract may be illegal because of the wrongful purpose of only one of the contracting parties; the other party, not being *in pari delicto,* may enforce it. (*Tri-Q, Inc.* v. *Sta-Hi Corp., supra,* 63 Cal.2d at p. 219; *Tiedje* v. *Aluminum Taper Milling Co.,* 46 Cal.2d 450, 454 [296 P.2d 554].) In literal terms, section 877 speaks of a release which is "given" in good faith, permitting the implication that the state of mind of the claimant who "gives" the release is the only pivotal factor. That implication would frustrate the objective of settlement finality, for the settling tortfeasor would take his release at the risk of the injured party's private scheme. Forfeiture of the release given the innocent settlor would be disproportionately harsh. (*Lewis & Queen* v. *N. M. Ball Sons, supra,* 48 Cal.2d at p. 151.) More appropriately, the sanction for breach of good faith falls only upon the party guilty of the breach, for only then does the other party to the settlement have assurance of its finality. The tortfeasor who himself compromises in good faith should receive exactly what the statute tenders him—discharge from his liability for pro rata contribution. (Code Civ. Proc., § 877, subd. (b).)

In concluding a bad faith settlement with one of several tortfeasors, the claimant breaches a statutory duty of good faith he owes the others. If the release discharges the settling tortfeasor from contribution liability, the nonsettling tortfeasor is damaged by the loss of a codefendant who would have shared pro rata payment of the judgment. The expense of the loss is measured by the pro rata share which the settlor would have borne had he been on the judgment. The contribution law provides no express remedy for the claimant's breach of statutory duty. "For every wrong there is a remedy." (Civ. Code, § 3523.) The violation of a statute supplies to any person within the statute's protection a right of action to recover damages caused by the violation. (*Wetherton* v. *Growers Farm Labor Assn.,* 275 Cal.App.2d 168, 174 [79 Cal.Rptr. 543]; *McIvor* v. *Mercer-Fraser Co.,* 76 Cal.App.2d 247, 253-254 [172 P.2d 758]; 1 C.J.S., Actions, § 9.) ■ The nonsettling tortfeasor has a civil claim for damages against the claimant who exercised bad faith. He may set off this claim against the latter's tort recovery and receive credit against any judgment recovered in the tort suit. In money terms, he receives pro rata rather than *pro tanto* credit against the judgment.

## IV

Finally, we consider the procedures available to vindicate the substantive rights of the wronged tortfeasor. We have already concluded that dismissal

of the claimant's tort recovery action is not a permissible remedy. In the present case, conceivably, petitioners might have moved to set aside the court orders approving the minors' compromises, or at least that phase of the orders approving allocation of the settlement money between the personal injury damages and wrongful death damages. Judicial approval of that allocation occurred here because of the fortuity that the claimants were minors. Had they been adults, the settlements would have been entirely private. ■ The statutes provide only an ex parte proceeding for the approval of a minor's compromise. (Code Civ. Proc., § 372; Prob. Code, § 1431.) When the settlement's good faith is not an issue in that proceeding, and the nonparticipating tortfeasor is not a party to it, he is not barred from later attack. (See generally, 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, § 197, pp. 3335-3336; § 222, p. 3357.) Direct attack on the order approving the minors' compromise is not an appropriate remedy.

The good faith issue may be litigated within the framework of the claimant's tort suit. In the present case, where the nonparticipating defendant does not charge the settling defendants with lack of good faith, we need not inquire whether he may bring them into the lawsuit as new parties defendant. (See *Thornton* v. *Luce, supra,* 209 Cal.App.2d at pp. 550-553; *Balding* v. *D. B. Stutsman, Inc.,* 246 Cal.App.2d 559, 562 [54 Cal.Rptr. 717]; cf. *Roylance* v. *Doelger,* 57 Cal.2d 255, 260-261 [19 Cal.Rptr. 7, 368 P.2d 535]; *Halpin* v. *Superior Court,* 14 Cal.App.3d 530, 544 [92 Cal.Rptr. 329]; see also, Code Civ. Proc., §§ 389, 426.30, 428.10-428.70, operative as to actions commenced on and after July 1, 1972.) Of significance here is the method of raising the claim of bad faith in settling with a tortfeasor whose discharge is not challenged.

Code of Civil Procedure section 437 (as amended by Stats. 1951, ch. 1737) governs the issues which may be raised by answer in lawsuits commenced prior to July 1, 1972. In attacking the extrajudicial settlement, the defendant has no present claim for damages because he suffers no damage unless and until he suffers an adverse judgment in the tort suit. ■ Thus the charge of bad faith settlement is appropriately regarded as a "statement of . . . new matter constituting a defense" to be asserted by answer under section 437.

Code of Civil Procedure section 431.30 governs answers in actions commenced on and after July 1, 1972. Like the former statute, it permits an answer to raise "new matter constituting a defense." Thus, under either the old or new pleading statutes, an answer is the appropriate vehicle for raising the partial defense of a bad faith settlement with an unsued tortfeasor.

Usually it will be helpful to determine validity of the settlement before the tort action goes to trial. Only in the light of that determination will the parties be able to form their attitudes toward further settlement and shape their trial tactics. In most cases evidence of the circumstances of the settlement would clutter the tort trial with irrelevancies and possible prejudice. The trial court may hear and decide the defendant's claim as a separate defense under Code of Civil Procedure section 597 or order a separate trial of the good faith issue under section 1048.

In some cases the injured party will have withheld a lawsuit, thus failing to provide a procedural framework for resolution of the charge of bad faith settlement. Its resolution may assist the parties toward settlement. A damage action would be dubious, since the nonsettling tortfeasor can normally claim no damage except by way of setoff against a tort judgment. Although section 877 does not itself provide a remedy for the statutory wrong, the courts have full power to provide necessary protection. (*Williams* v. *Int. etc. of Boilermakers,* 27 Cal.2d 586, 590 [165 P.2d 903].) No reason occurs to us why declaratory relief, with its priority of trial setting, would not be an appropriate remedy. (Code Civ. Proc., §§ 1060, 1062a.)

There is no superior court proceeding in which petitioners have sought or been denied appropriate relief. Hence they are not entitled to a writ of mandate.

The petition is denied and the alternative writ of mandate discharged.

Janes, J., and Morony, J.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.