[Civ. No. 66792. Second Dist., Div. Seven. June 22, 1984.]

PABLO S. TORRES, Plaintiff, v.
UNION PACIFIC RAILROAD COMPANY,
Defendant; Cross-complainant and Appellant;
A. H. BOTTORFF COMPANY et al.,
Defendants, Cross-complainants and Appellants.

500

**COUNSEL**

Cummins & White, Joseph H. Cummins, Marshall W. Vorkink, Richard J. Wynne and James V. Shepherd for Defendant, Cross-complainant and Appellant Union Pacific Railroad Company.

Anderson, McPharlin & Conners, Thomas J. Casamassima and Eric N. Winter for Defendants, Cross-complainants and Appellants A. H. Bottorff Company and J. C. Hallman Manufacturing Company.

## Opinion

**THOMPSON, Acting P. J.**—This case calls upon us to define the term "good faith" as it is used in Code of Civil Procedure sections 877 and 877.6. Specifically, we must decide whether a settlement is in "good faith" when it is "too cheap," i.e., when it allows the settling codefendant to escape from the litigation without paying his fair share of the damages. We find that the standard of "good faith" is not met when a codefendant's settlement price is grossly disproportionate to his fair share of the damages. However, we find that the settlements at issue here involve no such gross disproportion and were therefore made in good faith. We, therefore, affirm dismissals made by the trial court, pursuant to its finding of good faith.

### Facts

On May 24, 1976, Pablo Torres (Torres), an employee of Union Pacific Railroad Company (Union), was about to leave work for the day when he discovered that his car had a flat tire. Needing a jack to enable him to change this tire, Torres borrowed a Jack-all-Jack from Union and started to work on his car, which was parked on Union premises. While so working, Torres tripped the reversing mechanism on the jack, and the jack handle jerked violently from the horizontal to the vertical position, striking Torres in the head and causing him to lose one eye.

Torres sued Union and the manufacturer and distributor of the Jack-all-Jack, A. H. Bottorff Company and J. C. Hallman Manufacturing Company, Ltd. (collectively Hallman). In his first count, Torres alleged Union's liability under the Federal Employers Liability Act. Four other counts sought damages against both Union and Hallman under theories of negligence, express warranty, implied warranty and strict liability.

After suit was filed, Union conducted certain experiments with the Jack-all-Jack to determine whether it was indeed hazardous. These experiments, Union claims, showed that the jack "ratcheted dangerously" when the reversing lever was engaged while the handle was in the horizontal position. Union also claims that later versions of the jack bear warning labels advising that the handle be placed in a vertical position before the reversing mechanism is engaged.

Union cross-complained against Hallman, alleging that its negligent design was responsible for Torres' injury. Hallman, in turn, cross-complained against Union, claiming that it negligently used and allowed Torres to use the Jack-all-Jack for unintended purposes. Settlement negotiations ensued among Union, Hallman, and Torres. Union and Hallman made one offer of

$200,000 to Torres; this $200,000 liability was to be split evenly between both parties. Torres rejected this offer, whereupon cooperation between the defendants began to break down.

Union finally made a sliding-scale offer to Torres, which the latter accepted. Under this "Mary Carter" agreement, Union paid Torres $200,000. Fifty thousand dollars of this was an outright settlement with Torres; the remaining $150,000 was a guarantee ensuring that if Torres' suit against Hallman failed, or fell short of $150,000, Torres would be entitled to keep the portion of the advance necessary to bring his total recovery, including the $50,000 outright settlement, to $200,000. In return for this settlement, Torres promised diligently to pursue his claim against Hallman and to return to Union the first $150,000 of any recovery from Hallman; Torres was entitled to keep any settlement received from Hallman in excess of $150,000.

Torres later settled with Hallman for $300,000. His ultimate settlement thus amounted to $350,000; of this Union paid $50,000 and Hallman paid $300,000.

Union sought court approval of the good faith of its settlement pursuant to Code of Civil Procedure[1] section 877.6. Hallman challenged this settlement, claiming that it was not made in good faith and that Hallman was therefore entitled to seek equitable indemnity from Union. Hallman, in turn, sought approval of the good faith of its settlement pursuant to 877.6, and Union in turn objected, claiming that Hallman's settlement was not made in good faith since Hallman was primarily liable and therefore responsible for all the damages to Torres. After an extensive hearing conducted pursuant to section 877.6, the trial court found that both parties' settlements were made in good faith and that equitable indemnity was therefore barred. The court thereupon entered orders of dismissal against both Union's and Hallman's cross-complaints against each other.

Hallman appeals from the order of dismissal based on the trial court's finding of good faith; Union responds and cross-appeals from the dismissal of its cross-complaint.

### Discussion

A settlement made in good faith by an alleged tortfeasor discharges that tortfeasor from liability for contribution or equitable indemnity to any other joint tortfeasor. (§§ 877, 877.6.) On appeal Hallman contends that Union's

---

[1]Unless otherwise indicated, all references are to the Code of Civil Procedure.

settlement is not in "good faith" within the terms of section 877, and is therefore not sufficient to discharge Union's liability to Hallman for implied equitable indemnity. Hallman, however, does not impute to Union's settlement any wrongful means or malignant motive. Rather, Hallman argues that Union's settlement here is lacking in good faith because its price is too low; the settlement, Hallman concludes, allowed Union to escape from this action without paying its fair share.

In making this argument, Hallman exposes a point of conflict in California case law. It is well settled that certain settlement tactics or motives constitute bad faith. For example, a plaintiff might single out the most unpopular of several codefendants and settle with all the other codefendants, leaving the unpopular party to face the jury alone. (See *Lareau* v. *Southern Pac. Transportation Co.* (1975) 44 Cal.App.3d 783, 794 [118 Cal.Rptr. 837].) Or a plaintiff might settle with a defendant capable of providing crucial witnesses, in order to deprive the defense of these witnesses' testimony. (See *Commercial U. Ins. Co.* v. *Ford Motor Co.* (9th Cir. 1981) 640 F.2d 210.) Another wrongful tactic is seen in multiple-count lawsuits when a codefendant and plaintiff settle after conspiring to assign a disproportionately large amount of their settlement to the plaintiff's least valuable counts; this leaves the nonsettling codefendants fully exposed to the plaintiff's most valuable counts. (See *River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986 [103 Cal.Rptr. 498].) The conflict in California law does not concern such cases, where the absence of good faith is clear. Rather, this conflict is brought to light when the only fault attributed to a settlement is that its price is disproportionate to the settling party's fair share of the damages. Such disproportion is the gravamen of Hillman's complaint on appeal. Accordingly, we are faced squarely with this conflict in our law.

This conflict finds its origin in the more profound conflict between two policy considerations underlying section 877. The first such consideration is the legislative desire to promote the settlement of disputes and the finality of such settlements. (*River Garden Farms, Inc.* v. *Superior Court, supra,* 26 Cal.App.3d at p. 993.) The second and conflicting consideration is the policy that tortfeasors ought to pay for their fair share of the damages which they cause, and that they ought not to escape this burden by means of an unreasonably low settlement. (*Id.,* at p. 993.) Some authorities attribute more importance to the latter policy, others to the former. (Cf. *River Garden Farms, id.,* at p. 993; *Cardio Systems, Inc.* v. *Superior Court* (1981) 122 Cal.App.3d 880, 889 [176 Cal.Rptr. 254].) There is agreement, however, that the policy of promoting settlements and the policy of fairness conflict. (See *Lareau* v. *Southern Pac. Transportation Co., supra,* 44 Cal.App.3d at pp. 795-796.) Thus, the first goal, that of promoting settlements, is hindered by any postsettlement process designed to ensure the

fairness of the settlement. This is so because parties will be less willing to settle if they are prevented from closing their books on a case by fears that their settlement will later be attacked by codefendants seeking indemnity.[2] On the other hand, the second goal, that of fair apportionment of damages, is defeated when a guilty defendant is permitted to settle for a nominal sum, leaving codefendants to bear the costs of the settling defendant's wrongs.

In two recent cases, courts have thrown up their arms and declared this conflict intractable, incapable of judicial resolution. (*Burlington Northern R.R. Co.* v. *Superior Court, supra,* 137 Cal.App.3d 942; *Cardio Systems, Inc.* v. *Superior Court, supra,* 122 Cal.App.3d 880.) In these cases, the courts side with the policy of encouraging final settlements; they hold that any settlement, no matter how small, is impervious from attack by codefendants under section 877, so long as it is made without tortious or wrongful intent. These courts decry the patent unfairness of this result, but declare that any balancing between the policies of fairness and finality must be struck by the Legislature.

In *Cardio Systems,* the plaintiffs' decedent died when a brain embolism was caused as a result of the improper assembly of a heart-lung machine. Decedent's widow and children sued the manufacturer and distributor of the machine and the hospital for wrongful death. The distributor settled for costs. The hospital later settled for $1 million and sought equitable indemnity against the distributor. The trial court found that the distributor's settlement was not made in good faith and therefore held that section 877 did not bar equitable indemnity. The appellate court reversed, holding that the good faith requirement precluded only tortious or wrongful conduct. Since no such conduct was alleged, the court held that the distributor's settlement for costs was made in good faith. The court labelled its result "unsatisfactory" and "fundamentally unfair" and called upon the Legislature to amend section 877. (122 Cal.App.3d at pp. 890-891.)

In *Burlington, supra,* 137 Cal.App.3d 942, plaintiff was injured by the door of one of defendant Burlington's railway cars. Plaintiff sued Burlington and the manufacturer of the car. Burlington settled with plaintiff by entering into a sliding scale "Mary Carter" agreement which guaranteed plaintiff $2

---

[2]We think that this point has been overemphasized. (See, e.g., *Burlington Northern R.R. Co.* v. *Superior Court* (1982) 137 Cal.App.3d 942, 945 [187 Cal.Rptr. 376].) A settling defendant undoubtedly desires to "close his books on a case" and may well fear subsequent liability to his nonsettling codefendants. We doubt, however, that this fear will often cause the defendant to eschew a favorable settlement with the plaintiff. After all, the plaintiff's claim poses the greatest and most immediate threat to the defendant; liability to codefendants is more remote and contingent. Most defendants will be eager to rid themselves of the immediate threat from plaintiff, even if this threat is thereby replaced with the less likely prospect of liability to a codefendant.

million. In return, plaintiff promised to prosecute the action diligently, not to settle for less than $2 million, and to return the first $2 million of any settlement to Burlington. The trial court found that this agreement was not made in good faith since it prompted prolonged litigation and was designed ultimately to prevent Burlington from bearing any of the burden for plaintiff's injuries. The appellate court reversed. It found the fairness of the settlement agreement "highly debatable" but ruled that "the requirement of good faith is meant to insure that the settling parties do not *tortiously* injure the nonsettling parties." (*Id.*, at p. 946, italics in original.) No such tortious injury had been alleged.

We agree that the conclusions reached in these cases were unfair, but we disagree with the necessity of reaching these conclusions. Earlier and better-reasoned cases make clear that the Legislature did indeed strike a balance between the policy of fairness and the policy of promoting settlements; the fulcrum of this balance is the requirement of good faith. (*River Garden Farms, Inc. v. Superior Court, supra,* 26 Cal.App.3d at p. 998; *Lareau v. Southern Pac. Transportation Co., supra,* 44 Cal.App.3d at p. 796.) The balance struck by this good faith requirement is in fact optimal. As explained below, in most cases where the settlement involves no tortious conduct or motive, the policy of promoting settlements will be indulged; any moderate disparity between a defendant's settlement price and his fair share of the damages will be tolerated, and the good faith requirement will cause the balance to tip in favor of the settlement. In some cases, however, the disparity between what was paid and what is fair will be so egregious as to constitute bad faith per se; in these cases the good faith clause will require that the balance be struck in favor of fairness, and equitable indemnity will be allowed.

This role of good faith as a mediator between policy considerations was recognized in *River Garden Farms, Inc. v. Superior Court, supra,* 26 Cal.App.3d 986. Speaking of the policy goals of promoting settlement and encouraging fair division of liability, the court noted: "Neither statutory goal should be applied to defeat the other. If the statute is to work well, the demand for good faith settlement should find its role as an accommodating factor between undesirable extremes." (*Id.*, at p. 998.)

The *Cardio Systems* and *Burlington* decisions go astray by ignoring the accommodating role of the good faith requirement and by adopting, albeit under protest, the undesirable extreme of promoting settlement at all costs. This error is founded upon an unreasonably narrow definition of the term good faith. As noted, these decisions hold that, for purposes of section 877, any settlement is in good faith unless based on tortious or wrongful conduct. (*Cardio Systems, Inc. v. Superior Court, supra,* 122 Cal.App.3d at p. 890;

*Burlington Northern R.R. Co.* v. *Superior Court, supra,* 137 Cal.App.3d at p. 946.) This narrow definition is inappropriate for three reasons. First, it destroys the balancing between policy extremes suggested above, making patently unfair settlements impervious to attack by codefendants under section 877. Second, the definition is not supported by the earlier cases dealing with section 877; those cases analogize the good faith requirement to the one owed by insurance carriers to their insureds (*Lareau* v. *Southern Pac. Transportation Co., supra,* 44 Cal.App.3d at p. 795; *River Garden Farms, Inc.* v. *Superior Court, supra,* 26 Cal.App.3d at p. 998), and hold that such a duty of good faith is owed by a settling defendant to codefendants (*River Garden Farms, Inc.* v. *Superior Court, id.,* at p. 996; *Lareau* v. *Southern Pac. Transportation Co., supra,* 44 Cal.App.3d at p. 795; *Commercial U. Ins. Co.* v. *Ford Motor Co., supra,* 640 F.2d at p. 213; *Owen* v. *United States* (9th Cir. 1983) 713 F.2d 1461, 1465-1466; cf. *Dompeling* v. *Superior Court* (1981) 117 Cal.App.3d 798, 809-810 [173 Cal.Rptr. 38]; *Cardio Systems, Inc.* v. *Superior Court, supra,* 122 Cal.App.3d at p. 890, contra). Third and finally, this definition of good faith cannot be what the Legislature intended. Had the Legislature desired to approve all nontortious settlements, it would merely have required that the settlements be "lawful"; instead, it required that they be in "good faith." Some intent must be accorded to the Legislature's choice of this more rigorous term. Like the court in *Lareau* v. *Southern Pac. Transportation Co., supra,* 44 Cal.App.3d at page 796, we think this term was chosen in order to mediate between the two policies animating the Legislature when it enacted section 877. And, like the court in *River Garden Farms, Inc.* v. *Superior Court, supra,* 26 Cal.App.3d at page 997, we find that, by using the term "good faith," the Legislature has "incorporated by reference the general equitable principle of contribution law which frowns on unfair settlements, including those which are so poorly related to the value of the case as to impose a potentially disproportionate cost on the defendant ultimately selected for suit."[3]

Section 877, then, requires that the settling codefendant look beyond the immediate prospect of a favorable deal with the plaintiff. Rather, the codefendant must "make a good faith determination of the relative liabilities" in the case. (*Commercial U. Ins. Co.* v. *Ford Motor Co., supra,* 640 F.2d at p. 213.) If such codefendant wishes to enjoy the section 877 bar against indemnity, he must make some attempt to place the price of his settlement within a reasonable range of his relative share of the liability.

---

[3]*River Garden Farms* and *Lareau, supra,* were decided before *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], and therefore deal with liability for contribution rather than equitable indemnity. These cases retain their vitality with regard to indemnity, however, inasmuch as the court in *American Motorcycle Association* (*id.,* at p. 604) cited *River Garden Farms* for its definition of good faith under section 877.

There is ample authority for the conclusion that "good faith" requires that the price of a defendant's settlement bear some relationship to the merits and values of the case against that defendant. It has long been recognized that "[t]he price of a settlement is the prime badge of its good or bad faith." (*River Garden Farms, Inc.* v. *Superior Court, supra,* 26 Cal.App.3d at p. 996; *Lareau* v. *Southern Pac. Transportation Co., supra,* 44 Cal.App.3d at p. 795; *Fisher* v. *Superior Court* (1980) 103 Cal.App.3d 434, 445 [163 Cal.Rptr. 47].) Price is more than a mere badge; it is one of the "many factors influencing the finding" of good faith. (*River Garden Farms, supra,* at 26 Cal.App.3d at p. 997.) Accordingly, a finding of bad faith will usually rest on other factors in addition to a low settlement amount. In some cases, however, the settlement price may be so egregiously low as to constitute a sufficient ground, by itself, for a finding of bad faith. We, therefore, hold that good faith is not present in these latter cases where a defendant settles by paying a sum which is grossly disproportionate to that defendant's fair share of the damages.

It will be said that the weakness of this conclusion, compared to that in *Cardio Systems* and *Burlington,* is that it will have some chilling effect on settlements. Realistically, however, it will be rare for a codefendant to resist a settlement for fear of the cross-complaints. A codefendant, after all, attains an advantage by settling; his liability to the plaintiff is thereby extinguished, and liability to the remaining codefendants will not arise unless and until the plaintiff prevails against them. We therefore doubt that the chilling effect of our conclusion will be great.

The vagaries of litigation, however, are notorious, and we concede that in some cases the policy of encouraging settlement will be furthered when a party, by settling, can finally "close the book" on a matter. Our conclusion here prevents the settling party from so doing, unless that party is certain that his settlement does not differ grossly from what is fair. Obviously, the trick for the practitioner will be to estimate what is fair. Settlement will be discouraged to the extent this is inestimable. However, as the court noted in *River Garden Farms, supra,* 26 Cal.App.3d at page 998: "The danger that a low settlement violates the good faith clause will not impart uncertainty so long as the parties behave fairly and the courts maintain a realistic awareness of settlement imponderables."

One such settlement imponderable is the liability figure ultimately decided by a jury. A settling party may well have a good faith belief that a claim is worth much less than the value the jury finally assigns to it. Accordingly, this figure should not be used in determining whether a settlement is in good faith. (See *River Garden Farms, Inc. supra,* 26 Cal.App.3d at p. 977; *Fisher* v. *Superior Court, supra,* 103 Cal.App.3d at p. 444; *Kohn* v. *Superior*

*Court* (1983) 142 Cal.App.3d 323, 328 [191 Cal.Rptr. 78].) In order to promote the finality of settlements, we hold that a defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be.

This holding should discourage fraudulent or sham settlements, as well as settlements which are unfair because they are simply "too cheap." By the same token, this standard should encourage defendants, who really do wish to "close the book" on a matter, to arrive at a settlement figure which bears some relationship to what is fair.

Armed with this standard, we examine the settlements in the case at bench.

### Union's Settlement With Torres Was Made in Good Faith

In the case at bench Hallman manufactured the dangerous object; Union bought it and lent it to the injured party, its employee Torres. The trial court weighed the merits and values of Torres' claim against both Hallman and Union, including the claim that Union was liable under the Federal Employers Liability Act. After a lengthy hearing, the trial court found "substantial doubt" as to Union's liability to Torres and "convincing evidence" that Hallman was responsible for the defective condition. The court found that Union's guarantee and ultimate payment of $50,000 was fair settlement of Union's dispute with Torres.[4]

The record contains substantial evidence to support the finding that Union's settlement was fair. We have found no evidence that the settlement was in any way disproportionate to Union's fair share of the liability, let alone grossly disproportionate to this figure.

Accordingly, the summary judgment granted based upon the finding that this settlement was made in good faith is affirmed.

### Hallman's Settlement With Torres Was Also Made in Good Faith so as to Preclude Liability for Equitable Indemnity

The trial court found that the Hallman's $300,000 settlement with Torres was made in good faith. Accordingly, that court ruled that section 877.6

---

[4]Hallman complains that the trial court did not make findings of fact or conclusions of law. We find, however, that the court did make such findings and conclusions in its detailed judgment, which outlined the basis for its decision. This judgment makes clear that the court examined the relationship between Union's settlement price and its fair share of the damages and found no significant disproportion.

precluded Union's seeking equitable indemnity against Hallman. Union attacks this ruling by way of cross-appeal. Union argues that Hallman bore 100 percent of the liability for the injury to Torres and that Hallman was actively and primarily negligent in creating the defect in the jack. Union claims that its negligence, in contrast, was merely passive and secondary. Union concludes that section 877 does not work to bar indemnity in cases where one party bears all the fault and the other is secondarily negligent. (See *Huizar* v. *Abex Corp.* (1984) 156 Cal.App.3d 534 [— Cal.Rptr. —].)[5]

Whatever the merits of Union's argument, it is not applicable to the case at bench. Here, part of the wrongful conduct which Torres planned to allege at trial was Union's refusal to rehire Torres. Such a refusal was original to Union and is not attributable to Hallman. This case thus differs from total indemnity cases in that the plaintiff has attributed some specific primary fault to Union. Accordingly, section 877 and the good faith test enunciated above are applicable here. Applying these standards, we find no gross disproportion between the settlement price paid by Hallman and Hallman's fair share of the liability. Nor do we find any other evidence of bad faith. Accordingly, we find that the trial court acted properly in finding that the settlement made by Hallman was made in good faith so as to bar equitable indemnity. The judgment based on this finding is therefore affirmed.

The judgments of good faith and the judgments (orders) of dismissal are affirmed.

Johnson, J., and Pickard, J.,* concurred.

A petition for a rehearing was denied July 23, 1984.

---

[5]Cases such as *Huizar, supra,* create an exception to the harsh interpretation of sections 877 and 877.6, rejected above, which bars equitable indemnity in almost all cases. They do so by declaring that suits for total indemnity are not within the purview of section 877 and 877.6; a defendant may therefore sue his codefendant for *total* indemnity, even if that codefendant has entered into a good faith settlement. With the broader definition of good faith adopted here, however, it may well be urged this exception is not necessary and that all cases of indemnity, total and partial, should be subject to sections 877 and 877.6.

*Assigned by the Chairperson of the Judicial Council.