Laura STUBBS, Plaintiff,

v.

COPPER MOUNTAIN, INC.,
Defendant–Appellant,

and

Poma of America, Inc., Defendant–
Appellee.

No. 92CA0618.

Colorado Court of Appeals,
Div. V.

April 22, 1993.

As Modified on Denial of Rehearing
June 10, 1993.

Certiorari Granted Nov. 15, 1993.

Holland & Hart, Scott S. Barker, Marcy G. Glenn, Denver, for defendant-appellant.

Gallo & Godfrey, Brett Marshall Godfrey, Jerome M. Reinan, Denver, for defendant-appellee.

Opinion by Judge BRIGGS.

Plaintiff, Laura Stubbs, suffered serious injuries when she fell from a chairlift designed and supplied to defendant, Copper Mountain, Inc., (Copper Mountain) by defendant, Poma of America, Inc. (Poma). Copper Mountain appeals the trial court's ruling denying its motion to realign the parties and file a cross-claim for contribution from Poma. It contends, among other things, that the trial court erred in deciding whether a settlement between plaintiff and Poma was in good faith without allowing additional discovery, in adopting an inappropriate test of good faith, and in finding that the settlement between plaintiff and Poma was in good faith. We affirm.

Plaintiff's initial complaint named only Copper Mountain as a defendant. Plaintiff alleged that the single attendant on duty failed to notice that plaintiff, a novice skier, had not properly loaded onto the chair. As a result, the chairlift carried her part way up the mountain before being stopped. Plaintiff dangled fifty feet in the air until she fell to the ground below. She suffered severe spinal injuries that rendered her paraplegic. The claim against Copper Mountain was based on its alleged negligence in hiring, training, supervising, and staffing lift attendants and in its belated and unsuccessful attempt to rescue plaintiff.

Copper Mountain answered and designated Poma as a non-party at fault under § 13–21–111.5, C.R.S. (1987 Repl.Vol. 6A), based on Poma's design, manufacture, and sale of the lift. Plaintiff then amended her complaint to add Poma as a defendant.

Copper Mountain initiated settlement negotiations. During these negotiations both plaintiff and Poma disagreed with Copper Mountain's position that Poma was sub-

stantially at fault. Copper Mountain scheduled a settlement conference with plaintiff and Poma. Poma responded that it was not interested in participating in a joint settlement conference with Copper Mountain because Poma believed it was not liable.

Copper Mountain claims that, at the time of the settlement conference, it understood Poma and plaintiff to have an informal understanding that plaintiff would focus her case on Copper Mountain, but it did not know of any formal settlement agreement. However, plaintiff and Poma had in fact entered into a settlement agreement which provided that plaintiff would sign a covenant not to execute on any judgment obtained against Poma. In return Poma would immediately loan plaintiff $75,000. Plaintiff would repay the first $50,000 of the loan upon receipt of the first $1.5 million received from Copper Mountain, either from settlement or a jury verdict. Plaintiff would repay the remaining $25,000 upon receipt of the next $50,000 received from Copper Mountain.

Plaintiff and Poma also informally agreed that they would not reveal their settlement to Copper Mountain unless asked, that Poma would withdraw its motion for continuance, and that Poma would remain in the case and provide expert witnesses at trial to respond to any claim by Copper Mountain that Poma was at fault.

Approximately two months later, counsel for plaintiff and Copper Mountain orally reached a separate settlement agreement. The terms included plaintiff's agreement formally to release both Copper Mountain and Poma from liability. Copper Mountain desired that both defendants be released in order to preserve any right it might have to contribution from Poma.

In his letter confirming the settlement with Copper Mountain, plaintiff's counsel for the first time disclosed the prior formal settlement agreement with Poma. Counsel for Copper Mountain immediately responded that he had not previously been aware of the settlement agreement between Poma and plaintiff. He stated his belief that Poma's settlement contradicted the terms

of Copper Mountain's agreement with plaintiff because the release of Poma, if given in good faith, would preclude Copper Mountain from seeking contribution from Poma. Plaintiff's counsel responded that plaintiff would not seek to enforce the settlement if Copper Mountain desired to rescind the agreement, and they could proceed to trial.

Copper Mountain elected to continue negotiations and, prior to trial, settled with plaintiff on substantially the same terms as had been previously negotiated. Plaintiff executed a release of all claims against Copper Mountain and Poma.

Copper Mountain paid the settlement amount in full and then moved to realign the parties and file a cross-claim against Poma. Copper Mountain also served Poma with requests for production of documents and a notice to depose three of Poma's employees. Poma filed motions to dismiss and for a protective order against discovery and contested the motion to realign. Poma contended that pursuant to § 13–50.5–105, C.R.S. (1987 Repl.Vol. 6A), it was discharged from all liability for contribution because its settlement agreement with plaintiff was in good faith.

The trial court granted the protective order pending its ruling on the motion to realign the parties. After considering evidence presented at a two-day hearing on pending motions, supplemental affidavits, and arguments of counsel, it found that there was consideration for the agreement between plaintiff and Poma and that Copper Mountain was aware of all the terms of that agreement when it finalized its own settlement with plaintiff. The court concluded the evidence established that the settlement between plaintiff and Poma was made in good faith. It therefore dismissed the action with prejudice and discharged Poma from any liability for contribution. This appeal followed.

I.

Copper Mountain's first contention is that the trial court misconstrued § 13–50.5–105 in finding that Poma's settlement

was in good faith and thus discharging Poma from any liability for contribution. Copper Mountain argues that the duty of good faith extends to non-settling tortfeasors, that a settlement with a value grossly disproportionate to the settling tortfeasor's liability to the plaintiff violates the duty of good faith to the non-settling tortfeasor, and that plaintiff and Poma further acted in bad faith in colluding to conceal their agreement from Copper Mountain.

The question of the proper interpretation of the good faith provision of § 13–50.5–105 is one of first impression in Colorado. The statute is part of the Uniform Contribution Among Joint Tortfeasors Act (Uniform Act), first adopted in Colorado in 1977 and codified as § 13–50.5–101, et seq., C.R.S. (1987 Repl.Vol. 6A).

As pertinent here, § 13–50.5–105 provides:

(1) When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

. . . .

(b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

We agree that the duty of good faith extends to a non-settling tortfeasor. However, we are not persuaded that the scope of the duty is as broad as Copper Mountain urges, or that under the circumstances of this case the settlement was in bad faith toward Copper Mountain.

**A.**

■ Copper Mountain first contends that the duty of good faith must be construed to extend to the non-settling tortfeasors. We agree.

Some courts have taken the position that the duty extends only to the parties entering into the settlement agreement. This furthers the policy of encouraging settlements between joint tortfeasors and claimants. *See State ex rel. Sharma v. Meyers,* 803 S.W.2d 65 (Mo.App.1990).

Other courts, however, have recognized that because in every contract there is an implied obligation of good faith and fair dealing, construing the duty as applying only to the settling parties would render the language of the statute superfluous. *River Garden Farms, Inc. v. Superior Court,* 26 Cal.App.3d 986, 103 Cal.Rptr. 498 (1972). Limiting the duty of good faith to the parties making the agreement further ignores that the Uniform Act requirement of good faith serves not only the purpose of encouraging settlement, but also avoiding collusion. *See Noyes v. Raymond,* 28 Mass.App.Ct. 186, 548 N.E.2d 196 (1990); 12 Uniform Laws Annot., Uniform Contribution Among Tortfeasors Act § 4 (1975) (Commissioner's Comment to subsection (b)).

We conclude that the duty of good faith in the settlement between plaintiff and Poma extended to Copper Mountain. We must therefore determine the scope of that duty.

**B.**

Copper Mountain urges us to adopt the test of good faith first articulated by the California Supreme Court in *Tech–Bilt, Inc. v. Woodward–Clyde & Associates,* 38 Cal.3d 488, 213 Cal.Rptr. 256, 698 P.2d 159 (1985). In construing its similar provision the court in *Tech–Bilt* concluded that the concern of good faith went beyond fraud or dishonesty:

[A] number of factors [must] be taken into account [in determining good faith] including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of non-settling defendants.

*Tech–Bilt, Inc. v. Woodward–Clyde & Associates,* 38 Cal.3d at 499, 213 Cal.Rptr. at 263, 698 P.2d at 166.

This test of good faith, however, with its emphasis on whether the value of the settlement is grossly disproportionate to the settling tortfeasor's potential liability, has been criticized because of its undue impact on the goal of encouraging settlement and because it rests on a questionable analysis of the history of the Uniform Act. *See Tech–Bilt, Inc. v. Woodward–Clyde & Associates, supra* (Bird, C.J., dissenting); *Abbott Ford, Inc. v. Superior Court,* 43 Cal.3d 858, 239 Cal.Rptr. 626, 741 P.2d 124 (1987) (Mosk, J., dissenting).

Other courts have therefore limited the concern of the duty of good faith to actual collusion, fraud, and other wrongful conduct. *See Noyes v. Raymond, supra; cf. Ballweg v. City of Springfield,* 114 Ill.2d 107, 102 Ill.Dec. 360, 499 N.E.2d 1373 (1986).

As these cases demonstrate, the requirement of good faith in § 13–50.5–105 is subject to more than one interpretation. We must therefore consider factors such as the General Assembly's declaration of legislative intent, the circumstances under which the statute was enacted, the consequences of a particular construction in the context of other relevant provisions, and the policy and purpose manifested in the statutory scheme. *See Woodsmall v. Regional Transportation District,* 800 P.2d 63 (Colo.1990); *People v. Green,* 734 P.2d 616 (Colo.1987).

Section 13–50.5–106, C.R.S. (1987 Repl. Vol. 6A) provides that the Uniform Act "shall be interpreted and construed as to effectuate its general purpose to make uniform the law of those states that enact it." Therefore, in construing this statute we must also consider the history of the Uniform Act and decisions of other jurisdictions that have adopted a version of the Uniform Act, in conjunction with the relevant policies and laws of Colorado. *See, e.g., In re Question Submitted by United States District Court,* 196 Colo. 392, 586 P.2d 224 (1978).

The Commissioners' Comment explained the purpose of the good faith requirement:

The requirement that the release or covenant be given in good faith gives the court occasion to determine whether the transaction was collusive, and if so there is no discharge.

12 Uniform Laws Annot., *supra,* at 99.

■ "The public and judicial policies in Colorado favor the settlement of … disputes." *Colorado Insurance Guaranty Ass'n v. Harris,* 827 P.2d 1139, 1142 (Colo. 1992); *see Fibreboard Corp. v. Fenton,* 845 P.2d 1168 (Colo.1993). While a complete settlement is always preferable, even partial settlements should be encouraged. *See generally* Roberts, *The Good Faith Settlement: An Accommodation Of Competing Goals,* 17 Loy.L.A.L.Rev. 841 (1984).

The goal of encouraging settlements may be achieved only to the extent that claims for contribution based on allegations of bad faith are not routinely allowed:

If it were otherwise, a party seeking to avoid trial by settling a claim could rarely achieve that objective; either the issue of good faith would be the subject of a full trial or … a defendant who settles with a plaintiff may, nevertheless, be forced to stand trial on the merits of the tort claim. Faced with such prospects, a defendant would have little incentive to settle.

*Noyes v. Raymond, supra,* 28 Mass.App. Ct. at 199, 548 N.E.2d 196; *see Ballweg v. City of Springfield, supra.*

Limiting the application of the good faith requirement to collusive conduct also encourages settlement because the result is to involve the settling defendant in a more simple and efficient hearing.

Because the only issue with respect to whether a settlement is made in 'good faith' is whether the parties acted in a tortious manner toward the non-settling defendants, the non-settling tortfeasors who wish to dispute the finding of 'good faith' will not have much evidence to present at the hearing.

*Abbott Ford, Inc. v. Superior Court,* 43 Cal.3d at 897, 239 Cal.Rptr. at 652, 741 P.2d at 137 (Mosk, J., dissenting) (quoting Roberts, *The Good Faith Settlement: An Accommodation of Competing Goals, supra,* at 910); *see Tech–Bilt, Inc. v. Woodward–Clyde & Associates,* 38 Cal.3d at 502, 213 Cal.Rptr. at 265, 698 P.2d at 168 (Bird, C.J., dissenting) ("[A broad construction of the good faith rule] will clog our trial courts with unnecessary hearings, discourage the settlement of legitimate claims, and severely strain the resources of the parties and the trial and appellate courts of this state."); *cf. Colorado Insurance Guaranty Ass'n v. Harris,* 815 P.2d 983, 985 (Colo.App.1991), *aff'd,* 827 P.2d 1139 (Colo.1992) ("Colorado, like Michigan, has a public and judicial policy favoring settlement. However, we conclude that the 'good faith' rule adopted by the Michigan court would lead to excessive litigation by requiring a case-by-case determination of good faith, thus frustrating the primary purpose of encouraging settlement."); *see generally* Roberts, *The Good Faith Settlement: An Accommodation of Competing Goals, supra.*

Our interpretation of the good faith requirement in § 13–50.5–105 is also made in the context of other statutes which eliminate the risk of a non-settling tortfeasor being forced to pay more than its pro rata share of liability. Prior to 1986, § 13–50.5–105(1)(a) provided that a good faith release reduced the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever was the greater. Colo.Sess.Laws 1986, ch. 108, at 681. Also prior to 1986, § 13–21–111(3.5) provided that each defendant to whom some negligence is attributable was jointly and severally liable for the entire amount of the judgment. Colo.Sess.Laws 1986, ch. 108, § 6 at 682.

In 1986, the General Assembly altered the set-off provision of § 13–50.5–105(1)(a) to provide in part:

> [The release] reduces the aggregate claim against the others to the extent of any degree or percentage of fault or negligence attributable by the finder of fact, pursuant to section 13–21–111(2) or (3) or section 13–21–111.5, to the tortfeasor to whom the release or covenant is given....

*See* Colo.Sess.Laws 1986, ch. 108, § 13–50.5–105 at 681.

Sections 13–21–111.5(1), 13–21–111.5(3)(a), and 13–21–111.5(3)(b), C.R.S. (1987 Repl.Vol. 6A), were also enacted in 1986. Section 13–21–111.5(1) eliminates joint and several liability in most cases and instead provides that "no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant...." Sections 13–21–111.5(3)(a) and 13–21–111.5(3)(b) permit the finder of fact, in determining the degree or percentage of negligence or fault of those persons who are parties, to consider the negligence or fault of a person never made a party to the action and of a person who has been a party if the claimant has entered into a settlement agreement with that party.

The General Assembly has thus accomplished through this unique statutory scheme the separate goal of equitable sharing of payment for damages. *See Fibreboard Corp. v. Fenton, supra; Kussman v. City & County of Denver,* 706 P.2d 776 (Colo.1985). However, the goal is not accomplished without some cost to the goal of encouraging settlement. Section 5 of the 1939 version of the Uniform Act provided that a release of any tortfeasor would not release him from liability for contribution unless it expressly provided for a reduction to the extent of the pro rata share of the released tortfeasor of the injured person's recoverable damages. The provision was eliminated from the 1955 version because of its impact on settlement:

> Plaintiff's attorneys are said to refuse to accept any release which contains the provision reducing the damages "to the extent of the pro rata share of the released tortfeasor" because they have no way of knowing what they are giving up.

12 Uniform Laws Annot., *supra,* at 99. Under Colorado's statutory scheme of pro rata liability, plaintiffs face a similar un-

known if they settle with one or more but less than all defendants and potential tortfeasors.

To construe the good faith requirement in § 13–50.5–105 to allow attacks on settlement on grounds in addition to actual collusion would further discourage settlements with less than all those potentially liable for a plaintiff's injuries and damages. On the other hand, construing the provision to require nothing more than avoidance of actual collusion is not inconsistent with the *Tech–Bilt* goal of equitable sharing of payment for damages because under Colorado's separate statutory scheme Copper Mountain could not be held responsible for paying more than its pro rata share of liability even if it did not settle. *See Brochner v. Western Insurance Co.*, 724 P.2d 1293, 1299 (Colo.1986) ("In view of these legislative enactments, a tortfeasor no longer may unfairly be forced to pay all or a disproportionate share of damages suffered by an injured party as the result of negligent conduct by two or more joint tortfeasors.") At the same time, such a construction is consistent with the interpretation indicated in the Commissioners' Comments to the Uniform Act and with the policy in Colorado of encouraging settlement.

■ We therefore hold that in Colorado the appropriate test to determine if a settlement is made in bad faith is whether the agreement was the product of collusive conduct intended to prejudice the interests of the non-settling defendants. The fact that the amount of a settlement is low in comparison to a plaintiff's estimate of the total damages, standing alone, is not sufficient to establish bad faith. *See Noyes v. Raymond, supra; Dompeling v. Superior Court*, 117 Cal.App.3d 798, 173 Cal.Rptr. 38 (1981).

■ Proof of collusion in this context requires proof of something more than an agreement which results in the termination of any right of contribution. "The notion of collusion advanced by the Uniform Law Commissioners implies something more than mere confederacy. Any negotiated settlement involves cooperation, but not

necessarily collusion. It becomes collusive in this context when it is aimed to injure the interests of an absent tortfeasor." *River Garden Farms, Inc. v. Superior Court, supra*, 26 Cal.App.3d at 996, 103 Cal.Rptr. at 505.

■ The same concerns lead us to hold that the party challenging the good faith of a settlement otherwise barring a claim for contribution has the burden of establishing that the settlement was collusive. *See Noyes v. Raymond, supra* (burden of coming forward with some showing of lack of good faith ought to rest with those opposing the discharge of liability for contribution); *Abbott Ford, Inc. v. Superior Court, supra* (Mosk, J., dissenting).

## C.

■ Copper Mountain contends that Poma's settlement agreement fails to satisfy even a test of good faith which prohibits only collusive conduct because the only consideration actually paid was an interest-free loan for a period of approximately three months and because Poma and plaintiff concealed the agreement from Copper Mountain until the eve of trial. We are not persuaded.

The agreement between plaintiff and Poma is often referred to as a "Mary Carter" agreement or "sliding scale" agreement. In this type of agreement the amount ultimately paid by the settling tortfeasor, if any, is dependent upon the amount plaintiff is able to recover from the non-settling tortfeasor. *See Abbott Ford, Inc. v. Superior Court, supra; Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla. Dist.Ct.App.1967).

We note that the agreement between plaintiff and Poma did not contain a "veto provision" which would permit the settling party to control either the decision to settle or the amount plaintiff had to recover from the non-settling tortfeasor. *See In re Waverly Accident*, 502 F.Supp. 1 (M.D.Tenn. 1979); *Abbott Ford, Inc. v. Superior Court, supra*. As the trial court recognized here, if plaintiff recovered nothing

from Copper Mountain, it still owed nothing to Poma. Plaintiff was under no undue pressure to demand an amount of settlement that might have been more than Copper Mountain's pro rata share of liability, thus inhibiting Copper Mountain's own settlement negotiations, and plaintiff retained control over her decision regarding settlement.

The trial court's finding that there was consideration for the settlement agreement is supported by the record. Plaintiff's counsel testified at the hearing that he chose not to name Poma as a defendant in the initial complaint after a thorough evaluation of Poma's potential liability. After reviewing documents Copper Mountain provided in support of its argument that Poma was substantially at fault, plaintiff's counsel remained unconvinced that a jury would find Poma was at fault. He testified that he amended the complaint to name Poma as a defendant only after Copper Mountain designated Poma as a non-party and that he did so to prevent the "phantom defendant" or "empty chair" defense in which the appearing defendant maintains that the party responsible for plaintiff's injuries is not in the courtroom.

Part of the consideration for Poma's settlement was that it would remain in the case and provide expert witnesses to defend against any claim that it was substantially at fault for plaintiff's injuries. Plaintiff's counsel explained that plaintiff did not want to assume the responsibility for defending the product design case and thought it would encumber plaintiff's case and require resources plaintiff did not have.

Plaintiff's counsel also testified to plaintiff's immediate need to raise the $75,000 to buy a van that was equipped for her to drive so she could transport herself and her younger children. She had three children and with no transportation she was unable to leave her house. Despite repeated assurances, over the course of several months of negotiations, Copper Mountain had failed to make any settlement offers.

There was nothing collusive about requiring Poma to remain in the case to provide its own expert witnesses to respond to an "empty chair" defense. *See* *generally* R. Benson, *New Role For Nonparties In Tort Actions—The Empty Chair,* 15 Colo.Law. 1652 (September 1986). Further, "affording an injured person prompt payment of funds for [her] losses serves a very important state interest." *Abbott Ford, Inc. v. Superior Court,* 43 Cal.3d at 885, 239 Cal.Rptr. at 644, 741 P.2d at 141. Therefore, we conclude there was nothing in the structure of the agreement indicating a lack of good faith.

Copper Mountain finally asserts that plaintiff and Poma acted in bad faith by colluding to conceal their agreement from Copper Mountain and to misrepresent the status of their negotiations. It claims the goal was to induce Copper Mountain to agree to a settlement which released both Copper Mountain and Poma so Copper Mountain could seek contribution against Poma, yet with Copper Mountain then barred by the secret loan agreement from seeking that contribution.

The evidence as to whether and to what extent plaintiff and Poma may have concealed their settlement from Copper Mountain for a period of time was in sharp dispute. The trial court found that the evidence concerning the concealment of the agreement did not constitute bad faith.

■ While generally there is no duty to reveal the existence or terms of a settlement to a joint tortfeasor, we agree that here, because the agreement with Copper Mountain expressly provided for the release of Poma's liability so that Copper Mountain could seek contribution, knowledge that Poma had already reached a settlement was material. However, because Copper Mountain was informed of the terms of the settlement with Poma prior to finalizing its own settlement, we conclude the trial court's finding was not in error.

Copper Mountain contends that it was prejudiced by the delay in disclosing the existence of the earlier settlement because it lost valuable trial preparation time. It claims it could not go to trial and adequate-

ly represent its case and thus was "coerced" into going forward with its own settlement with plaintiff.

However, Copper Mountain learned of the Poma settlement no later than five days after it had reached its oral settlement agreement with plaintiff. There were still two weeks until trial. Plaintiff's counsel agreed that plaintiff would not seek to enforce the settlement agreement and that the parties could proceed with trial. Copper Mountain presented no evidence or argument establishing any actual impact the delay had on its trial preparation, and it did not request a continuance from the court after learning of the Poma settlement.

A finding of good faith will be reversed only upon a showing that it was clearly erroneous because of lack of evidentiary support or incorrect application of law. *See Owen v. United States,* 713 F.2d 1461 (9th Cir.1983). We conclude that, even accepting Copper Mountain's version of the facts, in these circumstances the record supports the trial court's finding that Copper Mountain failed to establish that the settlement between plaintiff and Poma was in bad faith.

## II.

Copper Mountain next contends the trial court erroneously decided good faith on an incomplete record and despite disputed facts. We again disagree.

■ Contrary to Copper Mountain's contention, unlimited discovery should not be available to a non-settling tortfeasor simply because it challenges the good faith of a settlement. Being subjected to such a procedure would itself unduly discourage settlement. However, there may be circumstances in which, upon a showing of good cause, some discovery would be warranted. The trial court must exercise its discretion based on the circumstances before it to fashion an appropriate procedure. The court must weigh the alleged need for discovery and presentation of evidence at a hearing against the need for keeping the procedure within a framework that does not discourage settlement or strain the resources of the settling parties or the court.

■ Here, even if we accept Copper Mountain's contentions regarding settlement negotiations, the lack of prejudice to Copper Mountain from the delay in revealing the Poma settlement precluded a finding of bad faith. Nor did the amount of settlement create an inference of bad faith. Copper Mountain failed to present any other asserted good cause why additional discovery or further testimony was necessary to resolve the issue of good faith. Thus, the trial court did not abuse its discretion in refusing to permit further discovery or testimony.

## III.

■ Copper Mountain asserts that a contractual claim for breach of warranty against Poma survives the settlement agreement with Poma and that Copper Mountain can recover as damages for its breach some or all of the settlement amount Copper Mountain paid to plaintiff. In the circumstances presented here, we disagree.

The chairlift was supplied to Copper Mountain by Poma pursuant to an equipment agreement which contained the following provisions:

> Poma guarantees that the Poma–Kissling gearbox, sheave liners, chairs, sheave assemblies, and structures shall be of merchantable quality and free from defects in design, materials, and workmanship and adequate for the purpose of transporting skiers for five years or 7,500 hours of operation from the date of certification, whichever comes first, and that all other components of the Ski Lift shall be merchantable quality and free from defects in design, materials, and workmanship and adequate for the purpose of transporting skiers for two years or 3,000 hours of operation from the date of certification, whichever comes first.
>
> . . . .
>
> Notwithstanding anything in this Equipment Agreement or any of the Attach-

ments to the contrary, in the event of any injury to a person, whether an employee of Owner or otherwise, arising out of the engineering, manufacturing, or use of the Ski Lift, nothing contained herein shall be deemed to limit in any way Owner's right to sue, join, or make claims against Poma under any theory of law or equity, whether arising by statute, common law, operation of law, contract, express or implied warranty, or otherwise. Poma has the same rights as Owner concerning Owner's use and operation of the Ski Lift.

Copper Mountain does not contend that the contract should be interpreted as an express agreement by Poma to indemnify Copper Mountain for any portion of the settlement payment. It nevertheless argues the trial court committed reversible error in dismissing Copper Mountain's "contract-based warranty claim against Poma, which was based on principles of contractual indemnity." The claim appears to be that Poma breached its warranty by providing a chairlift defective in design and that the damages recoverable for such a breach are the amount Copper Mountain paid in settlement to plaintiff.

However, even if we were to assume that such a claim is viable in some circumstances, here, none of the settlement payment by Copper Mountain can be attributed to any defect in the design of the chairlift. At the time Copper Mountain entered into its settlement agreement with plaintiff releasing both it and Poma, Copper Mountain was aware that Poma had already settled with plaintiff. As a result, Poma could be designated a non-party at fault, but could not be exposed to further liability to plaintiff even if the case proceeded to trial.

In turn, Copper Mountain faced no exposure at trial for any fault resulting from a defect in the design of the chairlift. The remaining claim against Copper Mountain was based on its own negligence in operating the chairlift in its existing condition. Thus, any settlement could represent only that sum for which Copper Mountain believed it could be held accountable based upon its own negligence. *See Union Pa-*

*cific R.R. Co. v. Allied Chemical Corp.,* 756 P.2d 394 (Colo.App.1988).

Hence, none of the amount paid by Copper Mountain to settle plaintiff's remaining claim against it can be attributed to a breach of warranty by Poma. The trial court therefore did not err in refusing to allow Copper Mountain to proceed with a cross-claim against Poma for damages in the form of the settlement amount paid by Copper Mountain based on a claim of breach of warranty. *See Union Pacific R.R. Co. v. Allied Chemical Corp., supra.*

## IV.

Additional contentions raised by Copper Mountain are that the settlement agreement between Poma and plaintiff is facially invalid because counsel did not sign the agreement as required by its own terms and because the agreement indirectly requires Copper Mountain to contribute to Poma's settlement, in violation of § 13-50.5-102(4), C.R.S. (1987 Repl.Vol. 6A). However, Copper Mountain failed to raise either of these arguments in the trial court. We therefore decline to address them here. *See City of Aurora v. Aurora Firefighters' Protective Ass'n,* 193 Colo. 437, 566 P.2d 1356 (1977).

## V.

Because we conclude the release was given in good faith it is unnecessary to address Copper Mountain's remaining argument that the court erred in construing plaintiff's release of defendants as a release by Copper Mountain of its contribution claim against Poma.

The order is affirmed.

RULAND and TAUBMAN, JJ., concur.