COPPER MOUNTAIN, INC., Petitioner,

v.

POMA OF AMERICA, INC., Respondent.

No. 93SC439.

Supreme Court of Colorado,
En Banc.

Feb. 6, 1995.

Holland & Hart, Scott S. Barker, Marcy G. Glenn, Denver, for petitioner.

Gallo & Godfrey, Brett Marshall Godfrey, Laura E. David, Denver, for respondent.

Justice SCOTT delivered the Opinion of the Court.

We granted certiorari in *Stubbs v. Copper Mountain, Inc.*, 862 P.2d 978 (Colo.App. 1993), to determine whether a violation of the good faith requirement of section 13–50.5–105, 6A C.R.S. (1987), discharging a settling tortfeasor from liability for contribution to nonsettling tortfeasors, requires collusive conduct.[1] Because we conclude that it does, we affirm the judgment of the court of appeals.

## I

Laura Stubbs, the plaintiff below, initiated this action against Copper Mountain, Inc., ("Copper") seeking damages for severe spinal injuries that rendered Stubbs a paraplegic when she fell from a chairlift at the Copper Mountain ski resort. The injuries occurred on February 24, 1990, when Stubbs attempted to board the American Flyer chairlift, a high-speed lift operated by Copper to transport skiers up the ski slopes. A novice skier, Stubbs had difficulty boarding the lift. According to testimony at trial given by Stubbs and other witnesses, she never

---

1. Our order granting certiorari set forth the issues as follows:

    Whether the court of appeals erred in holding that the test for whether a settlement agreement was executed in "good faith" under § 13–50.5–105, 6A C.R.S. (1987), is whether the agreement was the product of collusive conduct intended to prejudice the interests of the non-settling defendants.

    Whether a party challenging a settlement as not in good faith under § 13–50.5–105 must establish prejudice as a result of the settling parties' collusion or fraud, and, if so, whether the court of appeals erred in finding no prejudice in this case.

    Whether the court of appeals erred in affirming the dismissal of petitioner's contribution claim prior to discovery, where petitioner alleged that disputed material facts existed on the issue of good faith.

was properly seated in the chairlift and, as a consequence, was dangling from the lift during the ride up the mountain slope. Several employees of Copper disagreed, testifying that Stubbs was correctly assisted onto the lift but later slipped out of her chair while airborne. There is no dispute, however, that Stubbs hung from the airborne chair for a period of time before the chairlift was stopped by the lone lift attendant working at the base. Shortly after the lift was stopped, the ski patrol arrived by snowmobile below the point where Stubbs remained suspended in the air. Unfortunately, however, before the ski patrol was able to take any action, Stubbs fell to the ground and was seriously injured.

In March of 1990, Stubbs filed a negligence action against Copper. In her complaint Stubbs alleged that Copper was negligent in its hiring, training, supervising, and staffing of lift attendants, and in its unsuccessful attempt to rescue Stubbs.

Subsequently, Stubbs and Copper initiated settlement discussions regarding Stubbs' claims. In the course of settlement negotiations, Copper requested that Stubbs add as a defendant Poma of America, Inc. ("Poma"), the manufacturer and designer of the American Flyer chairlift. Stubbs declined, explaining that her investigations uncovered insufficient evidence to justify filing a lawsuit against Poma. In September of 1990, Copper designated Poma as a nonparty with fault pursuant to section 13–21–111.5, 6A C.R.S. (1987 & 1994 Supp.),[2] and ultimately

Stubbs amended her complaint to add Poma as a defendant.[3]

Soon after the addition of Poma as a defendant, Stubbs and Poma began settlement negotiations. They reached an agreement in April of 1991, which provided that Poma would loan Stubbs $75,000 in cash in exchange for Stubbs' promise not to execute upon any portion of a judgment entered against Poma.[4] The agreement also provided that in the event Stubbs did not prevail against Copper, she would not be required to repay the loan from Poma. Stubbs and Poma also informally agreed that initially they would reveal their settlement to Copper only if asked, that Poma would withdraw its motion for a continuance, that Poma would remain a named party defendant in the case, and that Poma would provide expert witnesses at trial to respond to any claims by Copper that Poma was at fault.

Meanwhile, unaware of the nature of the settlement discussions between Poma and Stubbs, Copper continued settlement negotiations with Stubbs. A joint settlement conference was held on May 2, 1991, which both Poma and Copper were originally scheduled to attend. Poma did not attend however, and neither Stubbs nor Poma provided any explanation to Copper during the settlement conference for Poma's absence. Poma asserts that it assumed Copper understood Poma's failure to appear at the joint settlement conference to mean that it had settled with Stubbs.[5]

2. Section 13–21–111.5(3)(b) provides that "[n]egligence or fault of a nonparty may be considered if the claimant entered into a settlement agreement with the nonparty or if the defending party gives notice that a nonparty was wholly or partially at fault within ninety days following commencement of the action...."

3. Stubbs' attorney testified at a hearing before the trial court that although Stubbs did not believe Poma was liable, she was forced to add Poma to avoid the "empty chair" or "phantom defendant" defense. This defense is used where a defendant designates a nonparty with fault; the named defendant is thus able to place all the blame on another person who is absent and not represented at trial. This effectively forces the plaintiff either to take on the role of defending the nonparty at trial or, as in the instant case, to add the nonparty as a defendant to ensure that

the nonparty will defend itself. *See generally* Reed D. Benson, *New Role for Nonparties in Tort Actions—The Empty Chair*, 15 Colo.Law. 1650 (September 1986).

4. According to the record, a portion of the proceeds of the settlement with Poma was utilized to meet certain of Stubbs' immediate needs, including the purchase of a motor vehicle specially modified for Stubbs' use.

5. Poma bases this contention on the testimony of Anthony Hirsch, an attorney retained to handle the case for Poma's insurance carrier. Hirsch testified that he told two attorneys for Copper, in separate conversations, that he would not attend the joint settlement conference in May "if there was a deal cut between Poma and the plaintiff." Hirsch did not attend the conference.

A little over a month after the joint settlement conference, Copper and Stubbs reached an oral agreement to settle Stubbs' claims for approximately $4.5 million. Under the original agreement, Stubbs would release both Copper and Poma from liability so that Copper would be free to pursue an action for contribution against Poma. In a letter confirming the proposed terms of settlement with Copper, Stubbs formally advised Copper of the settlement agreement it had reached with Poma. Copper immediately responded by letter, stating its belief that Stubbs' failure to disclose the agreement with Poma was a "material misrepresentation of fact." Copper's letter stated that it was a "clearly understood condition precedent" to Copper's offer that Stubbs "had done and would do nothing by way of a separate settlement which would inhibit [Copper's] contribution right against Poma."

In a written reply, Stubbs stated that she would not seek to enforce the settlement if Copper desired to rescind the agreement, and that the parties could then proceed to trial. Copper elected, however, to continue working towards a settlement. After further discussions, on June 27, 1991, Copper and Stubbs agreed to settle under substantially the same terms as were previously negotiated. Pursuant to their settlement agreement, Stubbs executed a release of all claims against Copper and Poma, and Copper paid Stubbs the amount under the settlement agreement in full.

Anticipating Copper's forthcoming claim for contribution, on July 21, 1991, Poma filed a motion for dismissal, contending that contribution was barred by its settlement with Stubbs under the provisions of section 13–50.5–105, 6A C.R.S. (1987 & 1994 Supp.). That section provides that when a covenant not to enforce judgment is executed in "good faith," it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor. On August 5, 1991, Copper moved to realign the parties and for leave to file a cross-claim against Poma for contribution. Copper also initiated discovery regarding the settlement agreement between Poma and Stubbs.

On August 7, 1991, Poma filed a motion for a protective order barring all discovery. That motion was granted and, after considering evidence presented during a two-day hearing, the trial court denied Copper's motion to realign the parties and dismissed the action with prejudice.[6] In reaching its ruling, the trial court found that the agreement between Stubbs and Poma was executed in good faith and that the existence of the agreement was not concealed or misrepresented. The court particularly emphasized the fact that Copper knew of the terms of the Poma–Stubbs settlement before it finalized its own settlement with Stubbs.

The court of appeals affirmed the decision of the trial court, holding that the test for whether a settlement is made in good faith is based on whether the parties engaged in "collusive" conduct intended to prejudice the interests of the nonsettling defendants. *Stubbs v. Copper Mountain*, 862 P.2d 978, 982–84 (Colo.App.1993). The court of appeals found no evidence of collusive conduct

---

6. The trial court held that "there is absolutely no evidence which supports Copper Mountain's argument that the agreement was concealed or misrepresented." The record contains evidence to support the version of facts argued by both parties. It includes affidavits submitted by four of Copper's lawyers, all asserting that Poma and Stubbs affirmatively misrepresented the status of their settlement. Copper's attorneys' statements are contradicted, however, by the testimony of Stubbs' counsel. At the hearing on Copper's motion to realign, Stubbs' counsel told the court that to his knowledge Copper Mountain never asked whether Stubbs and Poma had entered into a settlement agreement. Copper continues to deny knowledge of a settlement, contending that it was informed only that Stubbs had reached some type of informal agreement with Poma, allowing her to focus her attentions solely on Copper. Copper also alleges that both Stubbs' counsel and Poma's counsel denied having reached an agreement when Copper specifically asked whether a separate settlement agreement had been executed between Stubbs and Poma. Although the parties differ as to particular communications among counsel and as to when Copper first was aware of any settlement between Stubbs and Poma, it is undisputed that before it finalized its own settlement agreement with Stubbs, Copper was aware of the terms and conditions of Stubbs' settlement with Poma. Because the record supports the determination by the trial court that there was no misrepresentation, we accept its findings as we must, unless clearly erroneous. *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1384 (Colo.1994).

either in the structure of the settlement between Stubbs and Poma, or in the circumstances surrounding the disclosure of the agreement. *Id.* at 984–86. That court also found that the trial court did not abuse its discretion in deciding the issue of good faith without permitting further discovery or testimony on the contribution claim. *Id.* at 986.

We affirm the judgment of the court of appeals and conclude that for purposes of section 13–50.5–105, a settlement is reached in "good faith" in the absence of collusive conduct. Because of our resolution of the first issue for which we granted certiorari, we decline to address the remaining issues.

## II

### A

■ Initially we examine the court of appeals' determination as to whom section 13–50.5–105's duty extends.[7] Section 13–50.5–105 provides as follows:

**Release or covenant not to sue.** (1) When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

(a) It does not discharge any of the other tortfeasors from liability for their several pro rata shares of liability for the injury, death, damage, or loss unless its terms so provide; but it reduces the aggregate claim against the others to the extent of any degree or percentage of fault or negligence attributable by the finder of fact, pursuant to section 13–21–111(2) or (3) or section 13–21–111.5, to the tortfeasor to whom the release or covenant is given; and

(b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

§ 13–50.5–105, 6A C.R.S. (1987). Our statutory provision includes a verbatim enactment of section 4(b) of the Uniform Contribution Among Tortfeasors Act of 1955, 12 U.L.A. 98 (1975) ("UCATA"), the comment to which posits that "the requirement that the release or covenant be given in good faith gives the court occasion to determine whether the transaction was collusive, and if so there is no discharge." UCATA § 4 (1975) (Commissioner's Comment to subsection (b)). This interpretation by the drafters of the UCATA indicates an intent that the good faith obligation extend to the nonsettling defendant— the only party that could be the victim of such collusion. *See, e.g., Owen v. United States,* 713 F.2d 1461, 1464 (9th Cir.1983) (applying California's statutory bar to contribution claims only if settling parties acted in good faith with respect to nonsettling defendant); *Commercial Union Ins. Co. v. Ford Motor Co.,* 640 F.2d 210, 213 (9th Cir.) (same), *cert. denied,* 454 U.S. 858, 102 S.Ct. 310, 70 L.Ed.2d 154 (1981); *In re MGM Grand Hotel Fire Litigation,* 570 F.Supp. 913, 927 (D.Nev.1983) (good faith requirement imposed to protect the nonsettling defendant) (applying Nevada statute with language identical to section 13–50.5–105(1)(b)). Additionally, we adopt the reasoning of the court of appeals that "because in every contract there is an implied obligation of good faith and fair dealing, construing the duty as applying only to the settling parties would render the language of the statute superfluous." *Stubbs,* 862 P.2d at 981 (citing *River Garden Farms, Inc. v. Superior Court,* 26 Cal.App.3d 986, 103 Cal.Rptr. 498 (1972)). Thus, we agree with the court of appeals' determination that the duty of good faith extends to nonsettling tortfeasors, as well as to those persons who are a party to the settlement agreement.

### B

■ We next turn to a matter which is truly at the heart of this dispute—what constitutes "good faith" under section 13–50.5–105(1). Copper contends that the court of

---

7. Our order granting certiorari did not explicitly require the parties to address this matter. However, it is implicit in our review of the good faith requirements of this statute that we also determine the beneficiary of the statutory good faith mandate. Both parties apparently anticipated such consideration and thus addressed the question at oral argument. Moreover, we believe it is so intertwined with the meaning of the good faith requirement of § 13–50.5–105 that consideration of the reach of such duty is a predicate to resolving the questions before us.

appeals erred by not adopting the test for good faith first articulated by the California Supreme Court in *Tech–Bilt, Inc. v. Woodward–Clyde & Assoc.,* 38 Cal.3d 488, 213 Cal.Rptr. 256, 698 P.2d 159 (1985). Under the holding in *Tech–Bilt,* a court attempting to determine the good faith of a settlement is to engage in an analysis considering the following factors:

> a rough approximation of plaintiff's total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, ... a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial[,] ... the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants.

*Id.* 213 Cal.Rptr. at 263, 698 P.2d at 166–67. Specifically with regard to the settlement amount, the *Tech–Bilt* court indicated that the fact alone that a settlement does not reflect a "ballpark"[8] range estimate of the defendant's liability establishes an absence of good faith:

> The party asserting the lack of good faith, who has the burden of proof on that issue ... should be permitted to demonstrate, if he can, that the settlement is so far "out of the ballpark" in relation to these factors as to be inconsistent with the equitable objectives of the statute. Such a demonstration would establish that the proposed settlement was not a "settlement made in good faith" within the terms of section 877.6.

*Id.* at 263, 698 P.2d at 167. Thus, Copper contends the trial court erred in not allowing Copper the opportunity to prove that the settlement amount (a $75,000 loan) was not within the reasonable range of Poma's pro-portionate share of liability for Stubbs' injuries.

■ Copper argues that we are obligated to adopt the *Tech–Bilt* approach in light of the directive of section 13–50.5–106 that the provision shall be interpreted "to make uniform the law of those states that enact it." Contrary to Copper's contention, however, the *Tech–Bilt* reasonable range test does not command the support of a majority of jurisdictions that have considered this particular issue. Rather than reflecting a consensus, courts which have interpreted the UCATA's good faith provision are sharply divided as to which is the appropriate test to apply.[9] We thus reject Copper's contention that we are obligated to adopt the *Tech–Bilt* approach. With no definition provided by the statute itself, our determination of which test is appropriate is guided by the legislative history of the UCATA, the decisions of other jurisdictions which have adopted it, and relevant public policy in Colorado.

The *Tech–Bilt* analysis has come under considerable criticism both for its potentially negative impact on the policy encouraging settlement (*see, e.g., Noyes v. Raymond,* 28 Mass.App.Ct. 186, 548 N.E.2d 196 (1990) (noting that the uncertainty and expense involved in defending settlements against proportionality claims reduce a defendant's incentive to enter into a settlement); *Mahathiraj v. Columbia Gas of Ohio, Inc.,* 84 Ohio App.3d 554, 617 N.E.2d 737 (1992) (same)), and for the additional burdens it creates for trial courts in conducting evidentiary hearings to determine a party's likely proportionate liability. *See, e.g., Smith v. Texaco, Inc.,* 232 Ill.App.3d 463, 173 Ill.Dec. 776, 781, 597 N.E.2d 750, 755 (1992) (noting that Illinois courts have "consistently rejected challenges to good faith based upon alleged disparities

---

8. *See Abbott Ford, Inc. v. Superior Court,* 43 Cal.3d 858, 239 Cal.Rptr. 626, 655–56, 741 P.2d 124, 153 n. 3 (1987) (Mosk, J., dissenting) (criticizing the majority's use of this "sport-page idiom" as potentially puzzling to the reader of the text 25 or 50 years hence).

9. *See generally City of Tucson v. Superior Court,* 161 Ariz. 441, 444, 778 P.2d 1337, 1340 (App. 1989) (describing the two lines of authority which have evolved in other jurisdictions, the tortious conduct test and the reasonable range test); Lewis A. Kornhauser and Richard L. Revesz, *Settlements Under Joint and Several Liability,* 68 N.Y.U.L.Rev. 427, 443–44 & n. 74 (1993) [hereafter Kornhauser and Revesz] (noting that courts are divided on whether a good faith determination under the UCATA should involve only a procedural inquiry concerning the absence of collusion, or whether it should also scrutinize the

between the value of settlements and settling tortfeasors' relative culpability ... recogniz[ing] that settlements may be substantially different from the results of litigation because damages are often speculative and the probability of liability uncertain"); *Mahathiraj*, 617 N.E.2d at 740–41 (holding that the reasonable range approach is "cumbersome if not unworkable, in many cases because it forces courts to foresee whether a jury would find a particular party liable, and if liable, the proportion of liability the party would likely bear as well as the sum of damages the jury would award").

■ Furthermore, the legislative history of the UCATA does not support use of the *Tech–Bilt* approach. The history behind the enactment of the UCATA indicates that the drafters intended the phrase "good faith" simply to require noncollusive conduct. The comment made by the National Conference of Commissioners on Uniform State Laws ("the Commissioners") with regard to subsection (b) of section 4 of the UCATA,[10] provides in pertinent part as follows:

> The requirement that the release or covenant be given in good faith gives the court occasion to determine whether the transaction is collusive, and if so there is no discharge.

> ... Reports from the state where the [prior version of] the Act is adopted appear to agree that it has accomplished nothing in preventing collusion....

> The effect of [the prior version of] the 1939 Act has been to discourage settlements in joint tort cases, by making it impossible for one tortfeasor alone to take a release and close the file....

> It seems more important not to discourage settlements than to make an attempt of doubtful effectiveness to prevent discrimination by plaintiffs, or collusion in the suit. Accordingly the subsection provides that the release in good faith discharges the tortfeasor outright from all liability for contribution.

Unif. Contribution Act § 4, 12 U.L.A. 99–100, Comrs. cmt. on sec. (b) (1975). Not only does this comment plainly state that the clause is intended only to give the court "occasion to determine whether the transaction was collusive," it also indicates that the Commissioners had as their express purpose the facilitation of settlement, a goal best fostered if the phrase in question is interpreted as requiring noncollusive conduct. Without more, we accept the intent of the drafters of the uniform law as that of our own General Assembly by its verbatim enactment of the uniform act provision. *See Layne–Minnesota Co. v. Regents of the University of Minnesota*, 266 Minn. 284, 123 N.W.2d 371, 376 (1963) (indicating that intent of the drafters of a uniform act is assumed to be the intent of the legislative body enacting the provision).

Policy considerations also support the court of appeals' decision to adopt the noncollusive conduct definition of good faith. The policy favoring settlements is "[p]erhaps the principal and most often discussed policy relevant to the issue of a 'good faith' settlement." Florrie Young Roberts, *The "Good Faith" Settlement: An Accommodation of Competing Goals*, 17 Loy.L.A.L.Rev. 841, 883 (1984) [hereafter "Roberts"]. We recently acknowledged this important consideration to be given Colorado's policy favoring settlement. *Smith v. Zufelt*, 880 P.2d 1178, 1185 (Colo.1994) ("When considering alternative consequences, we will defer to results that encourage the settlement of disputes."). "Expanding the nature of a 'good faith' hearing beyond a procedural determination of lack of collusion to include substantive judicial scrutiny of the amount of the settlement has the simple effect of discouraging settlements." *See supra*, Kornhauser and Revesz at 476. Without question, one of the more important aspects considered by a defendant contemplating a settlement agreement is the degree to which he or she can be assured of the settlement's finality. Under the noncollusive conduct test applied by the court of appeals, a defendant can be relatively certain

substantive adequacy of the settlement, and citing cases).

**10.** Subsection 4(b) was added in place of § 5 of the 1939 version of the UCATA, which had provided that a settlement with a tortfeasor would

not release that tortfeasor from liability for contribution unless the release provided that plaintiff's ultimate recovery would be reduced to the extent of the released tortfeasor's pro rata share of the damages.

that his or her settlement will not be successfully attacked unless he or she entered the settlement with the intent to harm the non-settling defendant. On the other hand, under the reasonable range test advocated by Copper, a settling defendant would find it much more difficult to predict the ultimate outcome of a challenge to the agreement. Even where the defendant believes he or she has provided fair compensation to the injured party, it is possible that the reviewing court could find bad faith based on the amount of the settlement. *See Tech–Bilt,* 213 Cal.Rptr. at 268–69, 698 P.2d at 172 (Bird, C.J., dissenting) (the reasonable range standard "does not promote finality because it is admittedly vague"). Even the *Tech–Bilt* majority concedes the "speculative" nature of attempting to forecast damages and liability. *Id.* at 262–63, 698 P.2d at 166.

Additionally, even if a defendant is confident that the trial court will ultimately determine that the settlement was "in the ballpark" with regard to his or her proportion of liability, the prospect of being forced to defend against such an action may be sufficient to turn the defendant against settlement. Without question, such a proceeding would be far more complex and time-consuming than a proceeding held under the tortious conduct standard adopted by the court of appeals. Under the reasonable range standard, not only would the trial court be obligated to determine the overall damage and the settling party's proportionate share, the court additionally would have to evaluate "the strengths of the plaintiff's liability claim and defendant's defenses, the seriousness of the injury, the out-of-pocket expenses incurred by the plaintiff as a result of the injury, whether the case will be tried by a judge or a jury and if by a jury, whether juries from that location are more apt to render high or low verdicts, and a subjective evaluation of the parties, their witnesses and their attorneys." *See supra,* Roberts at 922, *quoted in Tech–Bilt,* 213 Cal.Rptr. at 267–68, 698 P.2d at 171 (Bird, C.J., dissenting). We echo the sentiments of the Massachusetts Court of Appeals in *Noyes v. Raymond,* 28 Mass.App.Ct. 186, 548 N.E.2d 196 (1990):

> The goal of encouraging settlements may be achieved only to the extent that motions for discharge based upon settlements are routinely allowed, with extended hearings on the question of good faith the exception. If it were otherwise, a party seeking to avoid trial by settling a claim could rarely achieve that objective; either the issue of good faith would be the subject of a full trial or, as happened in this case, a defendant who settles with a plaintiff may, nevertheless be forced to stand trial on the merits of the tort claim. Faced with such prospects, a defendant would have little incentive to enter into a settlement.

*Id.* 548 N.E.2d at 199.

Nor do we agree with Copper's contention that only partial settlements are encouraged by the noncollusive conduct definition of good faith. Copper contends that the noncollusive standard encourages an early, low settlement with one tortfeasor, which virtually ensures that the other tortfeasor will be forced to trial. This argument implies that upon agreeing to a seemingly low recovery with the first tortfeasor, a plaintiff will make an unreasonably high demand upon the second tortfeasor, which will force the second tortfeasor to go to trial in order to obtain a fair apportionment of liability. Had the Colorado General Assembly not abrogated joint and several liability in 1986, this argument might be valid. *See* § 13–21–111.5(1), 6A C.R.S. (1987) (eliminating joint and several liability in most cases and providing that "no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant"). Under a system of joint and several liability, the plaintiff would be at a distinct advantage after releasing the first tortfeasor in that the second tortfeasor would face the possibility of being held liable for the entire judgment despite being found only partially responsible.[11] Under our cur-

11. Before Colorado adopted its current system of apportioned fault, there was a danger that a plaintiff and a tortfeasor could enter into a sham covenant not to sue, inform the second tortfeasor that the covenant was in place, and force the second tortfeasor into a disproportionately high settlement out of fear that he or she would be

rent system of equitable apportionment of liability, however, the plaintiff and the second tortfeasor remain in the same position regardless of whether the first tortfeasor was released for less than his or her proportionate share of liability. Contrary to the argument put forth by Copper, the second tortfeasor is no more obligated to take the case to trial than he or she was prior to the initial settlement.[12] *See Stubbs*, 862 P.2d at 984–85.

In light of the intent of the legislature and the important public policy in favor of settlement of disputes, we decline to adopt the "reasonable range" test set forth in *Tech–Bilt*. Instead, we affirm the court of appeals' conclusion that for purposes of section 13–50.5–105, a settlement is reached in "good faith" in the absence of collusive conduct. We now consider whether the agreement in this case was collusive.

## C

■ Adopting the definition utilized by the California Supreme Court in *River Garden Farms, Inc. v. Superior Court*, 26 Cal. App.3d 986, 103 Cal.Rptr. 498, 505 (1972), the court of appeals explained that a collusive agreement requires more than mere confederacy: " 'Any negotiated settlement involves cooperation, but not necessarily collusion. It becomes collusive in this context when it is aimed to injure the interests of an absent tortfeasor.' " *Stubbs*, 862 P.2d at 984 (quoting *River Garden Farms*, 103 Cal.Rptr. at 505). The court also found that it is the burden of the party challenging the agree-

ment to prove that the agreement was collusive. *Id.* In addition, the court held a finding of good faith will be reversed only upon a showing that it was clearly erroneous because of lack of evidentiary support or incorrect application of law. *Stubbs*, 862 P.2d at 986 (citing *Owen v. United States*, 713 F.2d 1461 (9th Cir.1983)).

■ These legal conclusions are sound in law and are not disputed by Copper. Copper objects only to the factual findings of the court, claiming that even under the "intent to injure" definition of collusion applied by the court, the agreement here was entered in bad faith. We disagree.[13]

The trial court held that Stubbs disclosed the agreement to Copper prior to the execution of their settlement agreement. It might be argued that regardless of the fact the agreement was eventually disclosed, *at the time the parties entered into the agreement* they intended that it remain secret and it was therefore entered in bad faith. *See* § 13–50.5–105, 6A C.R.S. (1987 & 1994 Supp.) (stating that the agreement must be *"given* in good faith" in order to discharge the settlor from liability for contribution to any other tortfeasor) (emphasis added). As determined by the trial court, the facts do not indicate that the parties agreed to keep the settlement a secret. To the contrary, the uncontradicted testimony of Stubbs' counsel was that he "put a condition on [the] agreement that if Copper Mountain should ever ask for it that we would immediately produce it." On cross-examination, Stubbs' counsel

liable for the entire amount of damages even if found to be only partly responsible at trial.

**12.** For the same reason, we reject Copper's contention that the noncollusive conduct definition of good faith frustrates the important public policy goal of the equitable settlement of disputes. Because of the elimination of joint and several liability, in the absence of collusion, there is no threat that the second tortfeasor will be held liable for more than his or her pro-rata share of liability.

**13.** In its opinion, the court of appeals stated that the agreement between Stubbs and Poma "is often referred to as a Mary Carter" agreement. *Stubbs*, 862 P.2d at 984; *see also Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla.App.1967) (an agreement between plaintiff and one of multiple

defendants is collusive and secretive to the detriment of the nonsettling defendant). We did not grant certiorari as to whether the agreement was a "Mary Carter" agreement and, if so, whether such agreements are contrary to law and public policy. The facts of this case do not warrant our analysis of "Mary Carter" agreements. By affirming the court of appeals we are neither approving nor disapproving its conclusion that the settlement agreement between Stubbs and Poma was a "Mary Carter" agreement.

For a more complete discussion of Mary Carter agreements, see generally *Vermont Union School Dist. No. 21 v. H.P. Cummings Const. Co.*, 143 Vt. 416, 469 A.2d 742, 749–50 (1983); David Jonathan Grant, *The Mary Carter Agreement— Solving the Problems of Collusive Settlements in Joint Tort Actions*, 47 S.Cal.L.Rev. 1393, 1396–97 (1974).

explained that it was "nobody's idea that [the agreement] not be disclosed. It was my view that it was incumbent upon the party who wanted it to ask for it." Hence, the record supports the trial court's finding that Stubbs and Poma did not conceal or misrepresent the existence of the settlement agreement. We therefore reject Copper's argument that the instant agreement was undisclosed and hence is collusive. The element of secrecy is absent in the instant case, and there is no indication that even at the time Stubbs and Poma entered into the agreement, the parties intended to keep the agreement a secret.

 Nor do we believe an inference of collusion may be drawn simply because the agreement was not voluntarily disclosed for over two months after it was executed. Although early disclosure might be preferred, neither party was under any duty or obligation to disclose the agreement immediately upon its execution and Copper never submitted a formal discovery request regarding the agreement. Additionally, there is evidence in the record that Stubbs and Poma reasonably believed that Copper was aware of the settlement, and Copper admits it understood that there was at least an informal understanding between Stubbs and Poma that Copper would be the focus of Stubbs' suit. When it became apparent that Copper was planning to pursue contribution against Poma, and thus did not know of the agreement or understand its implications, Stubbs' attorney promptly disclosed the agreement.

Finally, we do not believe the agreement was collusive based on the fact that it called for Poma to remain in the case and provide expert witnesses to defend against any claim that it was substantially at fault for Stubbs' injuries. Stubbs' attorney explained that Stubbs did not want to take on the additional burden of defending the product design case, believing that providing such a defense would encumber Stubbs' case and require resources Stubbs did not possess. There is nothing collusive in this conduct.

14. We also find it unnecessary to discuss Poma's contention that the settlement agreement between Copper and Stubbs contained language

We thus conclude that the requisite "intent to injure" necessary to support a finding of collusion is not present in the instant case.

### III

Having determined that the agreement in question was entered in good faith pursuant to § 13–50.5–105, we find it unnecessary to address the second issue on which certiorari was granted: whether the court of appeals erred in holding that a party challenging a settlement as not in good faith must establish actual prejudice as a result of the settling parties' collusion or fraud.[14] Moreover, based on our resolution of issue one and our decision not to address issue two, we need not reach issue three—whether the court of appeals erred in affirming the dismissal of petitioner's contribution claim prior to discovery.

### IV

Because we find that a violation of the good faith requirement in section 13–50.5–105, 6A C.R.S. (1987), requires collusive conduct which was absent in this case, we affirm the judgment of the court of appeals upholding the trial court's order denying Copper's motion to realign the parties so that it may seek contribution and dismissing further proceedings.

specifically barring a contribution action by Copper against Poma, an issue which was not certified for review in our grant of certiorari.